**LIBERTY NATIONAL LIFE INSURANCE COMPANY,**
Plaintiff-Appellee,

v.

**UNITED STATES of America,**
Defendant-Appellant.

No. 77–1578.

United States Court of Appeals,
Fifth Circuit.

Aug. 13, 1979.

Rehearing Denied Sept. 20, 1979.

Gilbert E. Andrews, Act. Chief, App. Section, M. Carr Ferguson, Asst. Atty. Gen., Gary R. Allen, James E. Crowe, Attys., U. S. Dept. of Justice, Washington, D. C., Tax Div., for defendant-appellant.

Ralph B. Tate, Ira L. Burleson, Theron A. Guthrie, Jr., Birmingham, Ala., for plaintiff-appellee.

Before THORNBERRY, GOLDBERG and GEE, Circuit Judges.

THORNBERRY, Circuit Judge:

Once again[1] we are asked to enter the "fantasy world of life insurance company accounting and taxation." *Western Nat'l Life Ins. Co. v. Commissioner,* 51 T.C. 824, 830 (1969). The issue we must decide is whether discounts taxpayer Liberty National Life Insurance Company gave to holders of its industrial life insurance policies who paid at least twenty-six weeks of premiums

at one time were "discounts in the nature of interest" within the meaning of I.R.C. § 805(e)(3).

## I.

### A.

"Industrial life" insurance originated in nineteenth century England as a means of selling life insurance to the industrial workers who generally could not pay the relatively large annual premiums required by "ordinary" life policies. Three characteristics generally distinguish industrial policies from other types of life insurance. The premiums on industrial life policies are paid weekly rather than monthly or annually. The face amount of such policies is typically and, in some states, required to be less than $1,000. Last, an agent of the company collects the premium personally at the policyholder's home or place of employment. *See generally,* M. Davis, Industrial Life Insurance in the United States (1944). Although the weekly premiums for industrial policies are quite small, usually less than one dollar, the total premium the policyholder pays over the term of the policy is substantially higher than for an equivalent amount of ordinary life insurance.

### B.

Brown-Service Insurance Company, a predecessor of taxpayer, issued burial insurance policies, which provided funeral benefits on the death of the insured. Like industrial policies, the burial policies allowed payment of premiums weekly and in small amounts. In the 1930's, however, Brown-Service began to have financial difficulties and became desperate for fund with which to pay its operating costs and claims. To obtain these funds, Brown-Service encouraged its policyholders to pay several weeks premiums in advance and granted a discount to the policyholders who did so.[2]

---

1. *See, e.g., Republic Nat'l Life Ins. Co. v. United States,* 594 F.2d 530 (5 Cir. 1979); *Southwestern Life Ins. Co. v. United States,* 560 F.2d 627 (5 Cir. 1977), cert. denied, 435 U.S. 995, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978); *Great Commonwealth Life Ins. Co. v. United States,* 491 F.2d 109 (5 Cir. 1974); *Mutual Sav-*

*ings Life Ins. Co. v. United States,* 488 F.2d 1142 (5 Cir. 1974).

2. The Instruction Book for Brown-Service agents directed:
 A discount of 10% will be allowed on all premiums paid for 52 or more advance weeks.

Brown-Service's practice of granting discounts became well-known and enabled the company to survive the depression. Brown-Service then began to issue industrial life policies and made the discounts available on these policies also.

In 1944, Brown-Service merged with Liberty National Life Insurance Company, the latter company surviving. Prior to the merger, Liberty National had issued industrial life insurance, but had not granted discounts. After the merger, Liberty National wished to combine the operations of the two companies and to provide services to policyholders in a uniform manner. Therefore, the surviving company adopted and formalized Brown-Service's practice by including in its own policies provisions granting a five percent discount on premiums paid twenty-six weeks in advance and a ten percent discount on premiums paid fifty-two weeks or more in advance.[3] In 1967, Liberty National eliminated this language from newly issued policies, but continued to grant the discounts to holders of these new policies as well as to the holders of policies containing such provisions.

### C.

Throughout the history of the federal income tax, Congress has realized that, because of their unique financial structures, life insurance companies should not be taxed under the relatively simple formula applicable to most businesses. *See Commissioner v. Standard Life & Accident Ins. Co.,* 433 U.S. 148, 97 S.Ct. 2523, 2526–27, 53 L.Ed.2d 653 (1977). From 1921 until 1958, Congress taxed only the investment income of life insurance companies, and did not impose any tax on amounts the companies received as premiums on outstanding policies. The 1921 Act also allowed life insurers a deduction for "[a]ll interest paid or accrued . . . on . . . indebted-

ness." Revenue Act of 1921, ch. 136 § 245(a)(8), 42 Stat. 227, 262. While later variations of this provision were in effect, *see* 8 J. Mertens, The Law of Federal Income Taxation § 44.41 (1978 rev.), two life insurance companies attempted to deduct as "interest paid" discounts they had granted on premiums paid in advance. The Commissioner disallowed these deductions and the courts affirmed, holding:

> The money paid in advance by an insured to the company is not borrowed money. No indebtedness arises on the part of the company on the receipt of the money. The discount allowed is not payment for the use of borrowed money. The discounted sum received is the present value of the future amount due. The amount of the discount is the amount the company expects to earn by the use of the money before the regular due date of the premium. This amount added to the discounted value is expected to equal the amount payable on the due date had the premium not been paid in advance. This is in no sense interest on an indebtedness.

*Commissioner v. Monarch Life Ins. Co.,* 114 F.2d 314, 326 (1 Cir. 1940), *affirming* 38 B.T.A. 716 (1938); *Illinois Life Ins. Co. v. Commissioner,* 30 B.T.A. 1160 (1934), *aff'd on other grounds,* 80 F.2d 280 (7 Cir. 1935), *rev'd on such other grounds,* 299 U.S. 88, 57 S.Ct. 63, 81 L.Ed. 56 (1936). In *Equitable Life Assurance Soc'y v. Commissioner,* 44 B.T.A. 293 (1941), *modified and aff'd on other grounds,* 137 F.2d 623 (2 Cir. 1943), *aff'd,* 321 U.S. 560, 64 S.Ct. 722, 88 L.Ed. 927 (1944), however, the court found that an economically equivalent practice created an allowable deduction for interest paid. Rather than merely giving policyholders a discount on premiums paid in advance, Eq-

---

A discount of 5% will be allowed on all premiums paid for 26 advance weeks.
No discount will be allowed on premium payments in cases where less than 26 advance weeks are paid.

3. The wording of these provisions varied, but a typical policy provided:

(3) PREMIUM DISCOUNTS—Whenever premium payments are made for a period of 26 weeks in advance at one time, the Insured shall be given a discount equal to 5% of the total of such premiums paid in advance; and whenever premiums are made for a period of 52 weeks in advance at one time, the Insured shall be given a discount equal to 10% of the total of such premiums paid in advance.

uitable collected premiums under a "premium deposit agreement." In this agreement, Equitable contracted to accept funds from policyholders, to supplement them with accrued interest at a specified rate, and to apply the funds and interest to the payment of premiums as they became due. The Board of Tax Appeals found that the interest Equitable paid on the premium deposits was properly deductible as interest paid on an indebtedness. 44 B.T.A. at 310.

In 1959, Congress undertook a major revision of the income tax laws affecting life insurance companies. *Life Insurance Company Income Tax Act of 1959*, P.L. 86–69, 73 Stat. 112 (codified at I.R.C. §§ 801–820). This revision created a three phase procedure for the taxation of such companies. *See* 8 J. Mertens, The Law of Federal Income Taxation § 44A.04 (1978 rev.). The total tax liability of a company is based on the sum of amounts derived under each of the three phases. Each phase is determined by comparing two types of income, "gain or loss from operations," and "taxable investment income." Gain or loss from operations is the sum of the company's income from all sources, including the company's share of investment income and premiums received, minus the expenses of operation and payment of claims and dividends to policyholders. I.R.C. § 809. In computing the gain or loss from operations, only a portion of total investment income is included. Congress recognized that life insurance companies must provide for projected liabilities to their policyholders by establishing reserves to satisfy future claims, and therefore, that any income necessary to increase these reserves should not be taxed. The Code effectuates this recognition by dividing the total investment income between a nontaxable policyholders' share and a share belonging to the company, which is taxable. To determine the portion of investment income includible within the company's gain or loss from operations, the company must divide its "required interest" by the "investment yield." The required interest is basically the amount of reserves a company is required to maintain to satisfy policyholders' claims. I.R.C. § 809(a)(2).

Investment yield is the company's gross investment income less specified deductions such as expenses attributable to the investments, depreciation, and depletion. I.R.C. § 804(c).

Taxable investment income is comprised solely of the company's share of its total investment income. I.R.C. § 804. In computing taxable investment income, however, a different formula from that employed in determining gain or loss from operations is used in computing what portion of the total investment income belongs to the company. The taxable investment income formula requires that the company divide its total "policy and other contract liability requirements" by the investment yield. The policy and other contract liability requirements include largely the same items included in the required interest for gain or loss from operations, but these items are determined in a slightly different manner. I.R.C. § 805. One of the items included in policy and other contract liability requirements is "interest paid." I.R.C. § 805(e)(3). It is this element that is at issue in this case.

We are concerned only with the first two phases of the life insurance company taxing formula. Phase I is the lesser of taxable investment income and gain from operations. I.R.C. § 802(b)(1). Phase II imposes a tax on fifty percent of the excess, if any, of gain from operations over taxable investment income. I.R.C. § 802(b)(2). Although it is unclear from the record, the parties and lower court apparently agree that Liberty National's gain from operations exceeded its taxable investment income for the years in question and that the latter therefore was the Phase I tax base. This case arose because taxpayer treated the discounts on its industrial policies as interest paid on its returns. This treatment increased the policyholders' share of the total investment income and therefore decreased the taxable investment income and Phase I tax base of Liberty National. In short, because the company claimed the discount as interest paid, it paid less tax. The I.R.S. disallowed this treatment and taxpayer is now seeking a refund.

### D.

The Code explicitly recognizes that the interest paid deduction includes "discounts in the nature of interest" on prepaid premiums. I.R.C. § 805(e)(3).[4] Although the legislative history of the 1959 Act provides little insight,[5] the district court reasonably believed that Congress intended this provision to change the law declared in *Illinois Life* and *Monarch Life, supra,* and to allow a deduction for interest given either by discounts on prepaid premiums or through a premium deposit agreement. *See also Liberty Life Ins. Co. v. United States,* 594 F.2d 21, 26 (4 Cir. 1979), *petition for cert. filed,* 47 U.S.L.W. 3814 (U.S. June 19, 1979) (No. 78–1825).

Whatever the impetus for the passage of section 805(e)(3), it is clear that only discounts "in the nature of interest" may properly be deducted under that provision. Interest is usually defined as the price paid for the use of money. Liberty National argues that the entire amount of the discounts granted were interest and therefore deductible. The United States counters that, although a small portion of the discount may be attributable to interest, the substantial majority of the discount was granted for reasons other than payment for the use of policyholders' money. The district court accepted the arguments of Liberty National and held that the entire discount was properly deductible. *Liberty Nat'l Life Ins. Co. v. United States,* 77–1 U.S.T.C. ¶ 9107 (N.D.Ala.1976). The judge below reasoned that, as taxpayer's experts testified, three factors are generally considered in premium rate computation: mortality, expense, and interest. The mortality factor is the expected incidence of claims due to the deaths of insureds. The expense factor is the portion of premiums needed to pay the expenses of operating the company. The interest element is the expected earnings from investment of premiums. The profit a company wishes to enjoy from a policy is typically accounted for by adjusting the expense element in the company's favor. The judge found that the mortality factor was unaffected by the frequency of premium payment because an insured's life expectancy was unaffected by how he paid the premiums on his policy. The judge also concluded that the discount given by Liberty National was not attributable to decreased expenses on policies paid at least 26 weeks at one time. The company paid its agents the same salary and commission regardless of how frequently they collected premiums. Furthermore, granting the discount actually increased the company's costs in handling the premiums because it had to hire additional accounting personnel. Therefore, the court concluded that the entire discount was interest. As additional support for its conclusion, the court relied on two other factors. First, it recognized that Liberty National had adopted the practice of granting discounts from its predecessor, Brown-Service and that Brown-Service had clearly instituted the discount to acquire its policyholders' payments in advance of their due date. Second, the judge relied on Treasury Regulations and Revenue Rulings that indicated that certain discounts on life insurance premiums were interest. Treas.Reg. § 1.805–8(b)(3) (1960); Rev.Rul. 66–120, 1966–1 C.B. 14; Rev.Rul. 65–199, 1965–2 C.B. 20.

### II.

The United States challenges the district court's opinion in two ways. First, it ar-

---

**4.** That section provides that interest paid includes:

> All amounts accrued for the taxable year for discounts in the nature of interest, whether or not guaranteed, on premiums or other consideration paid in advance on insurance or annuity contracts.

**5.** The only helpful references to § 805(e)(3) in the legislative history are passages in the congressional reports stating:

> All of the interest payments included under this provision are similar in nature to the deduction for interest paid or credited on deposits by a bank and therefore properly are not taken into account in determining the income of the life insurance company making the payment.

S.Rep.No.291, 86th Cong., 1st Sess. 16–17 (1959), *reprinted in,* [1959] U.S.Code Cong. & Admin.News pp. 1575, 1591. *See also* H.R. Rep.No.34, 86th Cong., 1st Sess. 10.

gues that it presented sufficient evidence to prove the existence of an additional factor used in computing the premium rates and that the district court incorrectly rejected this evidence. The government asserts that if a policyholder pays the premiums on his insurance policy annually, the policy will likely remain paid up and in force longer than if the policyholder made weekly payments. This tendency is called "persistency." In support of its argument, the government presented computer studies and expert testimony that purported to show that policies on which the holders made a single annual payment would experience greater persistency over the first years of the policy than policies on which the holders made weekly payments. Furthermore, taxpayer's own witnesses testified that the persistency of a policy affected its profitability. The court refused to adopt this argument, however, because the government witness based his calculations on virtually arbitrary assumptions about taxpayer's expenses and the lapse rates on taxpayer's policies which were later shown to be incorrect. Furthermore, the studies attempted to predict the effect of annual payments on the policies' persistency only during the first years of the policies. Although life insurance policies experience the greatest lapse rate during their first years, only a very small percentage of taxpayer's industrial life policies on which the discount was granted were new policies. Thus, the studies were largely irrelevant to taxpayer's persistency experience. Third, the studies showed only that the discounted policies experienced increased persistency during the year that the annual payment was in effect. They failed to predict whether the holders of those policies were more or less likely to renew the policies than those who paid weekly. One of taxpayer's witnesses, in fact, testified that because the weekly premium payers may have acquired a habit of paying the smaller weekly premiums whereas the yearly premium payers had acquired no such habit and, to be eligible for the discount, would have to again make a large payment at the end of the annual period, those who paid annually may be more likely to allow their policies to lapse over the life of the policy.

 Last, and perhaps most importantly, the district court held that even if granting the discounts did improve the persistency of taxpayer's policies, there was no evidence that taxpayer based the granting or amount of the discount on any expectation of improved persistency. The United States implies that taxpayer's reasons for granting the discount are irrelevant, that if the discount actually improves the persistency and profitability of taxpayer's policies then the discount cannot be in the nature of interest. In other words, the government asserts that we must decide the objective question which of the rate computation factors does the discount most significantly promote rather than the subjective issue why did this taxpayer grant the discount. We disagree. As we indicate below, the objectively rational explanations for the taxpayer's actions are certainly relevant in determining the most likely subjective reason for those actions, but ultimately the taxpayer's subjective reasons for granting the discount must determine whether the discount was given for the early use of the policyholders' money. If Liberty National actually ignored any effect persistency may have had on its profitability and rate computation, we cannot now say that it should be taxed as if it had considered this factor. Because adequate evidence supports the district court's factual determinations that the government's witness and studies were not credible and that taxpayer did not base the discount on any expectation of increased persistency, we conclude that these determinations were not clearly erroneous.[6]

**6.** Although the ultimate issue of whether the discounts were in the nature of interest is one of law, the underlying issue why taxpayer granted the discount is factual and subject to the clearly erroneous rule on review. *Cf. Slap-* *pey Drive Ind. Park v. United States,* 561 F.2d 572, 585 (5 Cir. 1977) (whether corporation was formed with purpose avoiding income tax is a question of fact).

## III.

█ The government's second and more general argument is that even if it failed adequately to prove that taxpayer specifically considered the effect of persistency on the profitability, the taxpayer nevertheless failed to show the discount was interest. In a tax refund suit the burden is on the taxpayer to prove by a preponderance of the evidence that its position is correct. *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976); *Carson v. United States,* 560 F.2d 693, 695–96, (5th Cir. 1977). The judge below held that Liberty National met this burden. He accepted Liberty National's argument that it established its rates by reference to only three factors: mortality, expense, and interest. Because the judge also found that Liberty National did not give the discount in anticipation of either more favorable mortality experience or reduced expenses, he felt that the discount was logically attributable only to the interest element and was therefore deductible. While this syllogistic approach to factual findings may generally be valid, in this case there is inadequate support for either the minor premise or the conclusion.

### A.

█ Several types of evidence combine to convince us that taxpayer's discounts were not in the nature of interest. The sheer magnitude of the discount initially encourages us to discover some other explanation for the practice. Although the discounts were declared to be ten percent on premiums paid at least fifty-two weeks at one time, because taxpayer gave the discounts at the time the policyholder paid the premiums the effective rate of interest on the fifty-one payments that were not yet due

was approximately twenty-four percent.[7] This high rate is in sharp contrast to the four and one-half percent interest taxpayer gave to holders of its ordinary life insurance under premium deposit agreements and to the approximate six percent return that taxpayer earned on its investments. It somewhat strains our credulity that a life insurance company, whose very existence depends on keen financial planning and investment, would for over twenty years be so desperately in need of liquid funds that it would be willing to pay one group of policyholders twenty-four percent interest to acquire those funds immediately without offering other policyholders similar incentives and without being able to recapture that expenditure through its own investments.

Taxpayer and the district judge posit three reasons that, despite its size, the discount was given as interest. First, they emphasize that taxpayer adopted the practice from its predecessor, Brown-Service, and that the predecessor clearly granted the discount to its policyholders in payment for the early use of the advance premiums. Brown-Service initiated the discount in order to increase its available cash in the 1930's. From this historical fact, the district court reasoned that the discount granted by Liberty National in 1966 through 1969 was also interest. He stated: "One cannot, a quarter of a century later, say that what was done for specific reasons really was done for different reasons. . . . It was interest then; it is interest now." This analysis is faulty. That the discount originated as interest does not mean that it must retain that character in perpetuity. Liberty National adopted the discount in 1944 and continued to grant the discount on newly issued policies through the years in

---

7. The following table shows the effective annual rate of interest under various assumptions as to the number of weeks for which premiums are paid at one time:

| Weeks Paid | Discount | Effective Annual Rate of Interest |
|---|---|---|
| 26 | 5% | 24.0342% |
| 39 | 5% | 15.2194% |

| Weeks Paid | Discount | Effective Annual Rate of Interest |
|---|---|---|
| 51 | 5% | 11.3664% |
| 52 | 10% | 24.4734% |
| 78 | 10% | 15.5999% |
| 104 | 10% | 11.4447% |
| 156 | 10% | 7.4652% |
| 260 | 10% | 4.4025% |

question. There is no indication that Liberty National was in unusual need of funds either in 1944 or at any time since. Taxpayer has totally failed to explain why it would have been willing in 1966 through 1969 to provide such a great discount merely to have the early use of its policyholders' money.

The district judge explained his finding that the discount was interest despite its size in a second way also: "Although there may be some valid distinctions between interest and discounts, for tax purposes these distinctions are of little significance. *Dixon v. United States*, 224 F.Supp. 358, 364 (D.C. N.Y.1963) [*aff'd*, 333 F.2d 1016 (2 Cir. 1964), *aff'd*, 381 U.S. 68, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965)]." This reliance on *Dixon* and its analysis was unfounded. The *Dixon* court was concerned with whether the discount on a bond was taxable as ordinary income or as capital gain. There was no question that the discount was granted as payment for the use of money. Within the context of that opinion it is clear that the court merely held that, for purposes of classification as ordinary income or capital gain, there is no difference between interest and a discount in the nature of interest. Thus, *Dixon* is of little help in this case which concerns totally different sections of the Code and in which the crucial issue is that assumed in *Dixon*, whether the discount is in the nature of interest. The trial judge's reliance on Rev.Rul. 66–120, 1966–1 C.B. 14; Rev.Rul. 65–199, 1965–2 C.B. 20, and Treas. Reg. § 1.805–8(b)(3) (1960), is equally unfounded. The examples and directions given in those provisions are also based on the assumption that the discounts involved are in the nature of interest or are "the discounted value of the corresponding contract premiums. . . ." Rev.Rul. 66–120, 1966–1 C.B. 14, 15.[8] It is a basic accounting principle that discounts may be granted for various reasons, only one of which is interest. R. Wixon, W. Kell & N. Bedford, Accountants' Handbook 11:20 (5th ed. 1970).

The Code recognizes this principle by limiting the discounts that may be deducted to those "in the nature of interest." By declaring that there was no significant difference between interest and discounts, the judge below assumed away the very issue he was to decide. Because we disagree with the district court's reasoning, we believe that the very size of the discount taxpayer gave is some evidence that the discount was not in the nature of interest.

B.

A second type of evidence also causes us to believe that the discount was not interest. Other than the claim that the discount should be deductible as interest paid, taxpayer's treatment of the discount was inconsistent with its assertion that the discount was interest. It is undisputed that if the discounts were interest paid by taxpayer, they were also interest income to the policyholders. Rev.Rul. 66–120, 1966–1 C.B. 14; Rev.Rul. 65–199, 1965–2 C.B. 20. If any of the discounts exceeded ten dollars, the Code required the taxpayer to submit informational returns to the I.R.S. on form 1099. I.R.C. § 6049. Approximately 3,000 of Liberty National's 3,000,000 industrial life policyholders received a discount of more than ten dollars yet Liberty National failed to file 1099 forms with the I.R.S. for any of these policyholders. Taxpayer asserts that it realized it should file the required forms for its policyholders, but because its decentralized method of bookkeeping would make such filings very expensive that it consciously decided to disobey the law. We find this argument unconvincing. If Liberty National wishes to enjoy the benefits of deductions allowed by the Code, it must also suffer the expense of filing the proper records with the I.R.S.

The information taxpayer filed in its own returns is even more revealing. To determine a life insurance company's gain from operations, the Code requires the company to report as premium income the gross

---

8. Conversely, the government's reliance on Rev.Rul. 70–613 1970–2 C.B. 13, is also misplaced. As the district court recognized, that Ruling assumes that the discount involved was attributable to a "reduction in the expense (loading) element of the contract premium," rather than to interest.

amount of premiums received. I.R.C. § 809(c). If a company receives premiums on which it has granted a discount attributable to interest, it must report the full premium stated in the contract, including both the money actually received and the discount. Treas.Reg. § 1.809–4(a)(1), T.D. 6610, 1962–2 C.B. 154, 156. This is referred to as "grossing up" the premiums. On the other hand, if the discount is attributable to factors other than interest, such as expense or mortality savings, the company need only report the money it actually received from the policyholder, the contract premium minus the discount. In this second situation, the taxpayer reports the premiums "net of the discount." Rev.Rul. 70–613, 1970–2 C.B. 137. Liberty National effectively reported only the amounts actually received from the policyholder as premium income.[9] Thus, in determining its gain from operations, taxpayer treated the discounts as if they were attributable to expense or mortality savings rather than to interest. The district judge apparently believed that Liberty National's actions were sanctioned by the Internal Revenue Manual.[10] The Manual provides no support for taxpayer's actions. The provisions cited by the district court is only a summary of the treatment to be accorded discounts in the nature of interest on advance premiums and is explained in more detail in Revenue Rulings. Rev. Rul. 71–64, 1971 C.B. 207; Rev.Rul. 66–36, 1966–1 C.B. 171. These Rulings indicate that, as the Manual states, when premiums are received in advance, only the actual amount received is reported as premium income in the year of receipt. The Rulings explain further, however, that if the discount is in the nature of interest, it must be reported as premium income when the premium becomes due. Liberty National failed to report the discount as premium income at any time. Therefore, its treatment of the discount in the gain from operations portion of its tax return is inconsistent with its contention that the discounts were in the nature of interest.

### C.

Although the above facts indicate a probability that the discount Liberty National granted its policyholders was not in the nature of interest, they do not explain the true reason for granting the discount. This evidence may well be enough to rule in favor of the government, but we do not need to speculate on this possibility, however, because taxpayer's own witnesses indicated beyond doubt that Liberty National granted the discount for reasons entirely apart from the desire to obtain the early use of its policyholders' money. William Graves, Vice-president and Chief Actuary, and James Livingston, Jr., Senior Vice-president of Liberty National provided at least five reasons why taxpayer adopted the practice of granting discounts and continued it through the years in question. They testified that Liberty National wanted to maintain good relations with former

---

**9.** For the years 1966–67, taxpayer reported the premiums it received net of the discount as premium income. For the years 1968–69, taxpayer properly grossed up its premiums in reporting premium income, but then deducted the amounts given as discount under the category for "Other Deductions." Although I.R.C. § 809(d)(11) (as amended in 1976, formerly § 809(d)(12)) allows life insurance companies to deduct items that other taxpayers are allowed to deduct, this allowance is specifically limited by § 809(e)(1), which states: "In applying section 163 (relating to deduction for interest), no deduction shall be allowed for interest in respect of items described in section 810(c)," which enumerates the items to be taken into consideration in computing the company's required interest. I.R.C. § 810(c)(5) includes within required interest any amounts paid as discounts in the nature of interest. Thus, even if we accept taxpayer's argument that the discounts were in the nature of interest, it improperly included those discounts within the category of other deductions. See Rev.Rul. 71–64, 1971–1 C.B. 207. Of course, because of the result we reach, the proper course for Liberty National would have been to report the premiums it received net of the discount and to treat the discounts as neither other deductions nor as includible within its required interest.

**10.** Part IV, Vol. 3, Internal Revenue Manual, Audit Technique Guidelines Relating to Specialized Industries ¶ 125.9(3) (Tax Analysts and Advocates ed. 1974), states: "When advance premiums are received at a discount, only the actual amount received is includable in gross premium income."

Brown-Service policyholders, who expected to be granted the discounts even though neither Brown-Service nor Liberty National originally had any contractual obligation to continue the practice; to avoid confusion in their bookkeeping from having one method of accounting for advance industrial premiums on which discounts were given and another method for such advance premiums that were not allowed the discount; to enable their collecting agents to compute the premium simply without confusion about whether the policy allowed the discount or not; to retain the loyalty of the Brown-Service agents who were accustomed to granting the discount; and, to improve its competitive position by allowing customers who received their income at particular times of the year, such as farmers, to pay when they had the money. None of these purposes indicate that the discount was given as interest. According to this testimony, Liberty National allowed the discount not as payment for the early use of the policyholders' money, but as a convenience to itself and its policyholders. If they must be categorized, the reasons for granting the discount appear to place it within the expense element of rate computation. This testimony, combined with the other evidence we discussed above, indicates that the district court was clearly erroneous in concluding that taxpayer intended the discount as payment for the use of money. Therefore, the court's holding that taxpayer properly deducted the entire amount of the discount as interest paid must be reversed.

We recognize that some part of the discount may be attributable to interest. In fact, the government admitted this at trial. Thus, it could be argued that the portion of the discount that is in the nature of interest is properly deductible. *Contra, Liberty Life Ins. Co. v. United States*, 594 F.2d 21, 28 (4 Cir. 1979), *petition for cert. filed*, 47 U.S. L.W. 3814 (U.S. June 19, 1979) (No. 78–1825). This was not Liberty National's argument, however. At all stages of this proceeding it has argued that the discount was entirely and solely interest. Taxpayer refused to argue that the discount could be partitioned even after the possibility was discussed at oral argument before this panel. Because Liberty National has failed to convince us of the validity of its only argument, we must sustain the Service's determination. The judgment of the district court is therefore REVERSED.[11]

---

11. The parties have agreed that if we reach this result, there is no need to discuss the other issues decided by the district court. These other issues involved alleged deficiencies that the government asserted only as offsets against any refund taxpayer may have received if this court had decided that the discounts were properly deducted as interest paid.