**LIBERTY NATIONAL LIFE INSURANCE COMPANY, Plaintiff-Appellee, Cross-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellant, Cross-Appellee.**

No. 86–7059.

United States Court of Appeals, Eleventh Circuit.

May 14, 1987.

Frank W. Donaldson, U.S. Atty., Birmingham, Ala., Roger M. Olsen, Michael L. Paup, Gary R. Allen, David I. Pincus, Trial Attys., Tax Div., Dept. of Justice, Washington, D.C., for U.S.

Ollie L. Blan, Jr., Samuel E. Upchurch, Jr., Tasha Brock Bates, Birmingham, Ala., for Liberty Nat. Life Ins. Co.

Before TJOFLAT and HATCHETT, Circuit Judges, and EATON *, Senior District Judge.

TJOFLAT, Circuit Judge:

Liberty National Life Insurance Company (Liberty National) brought this suit

* Honorable Joe Eaton, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

seeking a refund of federal income taxes assessed and paid for the years 1970 to 1977. The district court held that Liberty National was entitled to a refund of $7,321,847.57, plus additional statutory interest, because the Commissioner improperly rejected its method of allocating profit-sharing contributions based on the "source of the income" theory. In addition, the court rejected Liberty National's contention that a portion of discounts it granted for pre-payment of insurance premiums should be deductible as "discounts in the nature of interest" under I.R.C. § 805(e)(3) (1982) (amended 1984).[1] The Commissioner appeals from the district court's decision on the profit-sharing expense allocation claim, and Liberty National cross-appeals from the court's decision on the premium discount claim. We reverse on the allocation question, but affirm on the premium discount issue.

## I.

### A.

Liberty National is a life insurance company whose tax liability is governed by the special rules of I.R.C. §§ 801–820 (1982). During the years in question, it maintained a profit-sharing and retirement plan for its employees. It required each of its full-time employees to contribute three percent of his annual compensation to the profit-sharing plan. In addition, Liberty National contributed ten percent of its annual profits to the plan. This employer contribution was apportioned among the accounts of Liberty National employees according to a formula based on the employee's contribution for the year multiplied by a "participation factor," which depended on the number of years the employee had worked at the company. The purpose of the profit-sharing plan was "to make it possible for eligible employees to share in the Company's profit and to furnish a means for the accumulation of employee savings, Company contributions, and investment earnings in order to provide an income for employees at retirement."

During the years in question, Liberty National's annual contribution to the plan ranged from approximately $1.7 million to $8 million. For tax purposes, it was necessary for Liberty National to allocate its contributions between investment expenses and underwriting expenses. "Investment expenses" are deducted from gross investment income, under I.R.C. § 804(c)(1) (1982), in determining the company's taxable investment income. "Underwriting expenses," on the other hand, are deductible in the computation of total gain or loss from operations. See I.R.C. § 809(d)(11) (1982).[2] Liberty National had an incentive to allocate as much of its profit-sharing contributions to investment expenses as possible, because investment income is effectively taxed at a higher rate than is total income from operations, thus making an investment expense deduction more valuable than a deduction for underwriting expenses.[3]

---

1. Congress substantially revised the code provisions dealing with taxation of life insurance companies in the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494 (codified as amended in scattered sections of the I.R.C.) (Tax Reform Act of 1984). Unless otherwise noted, all subsequent references to the I.R.C. refer to the pre–1984 provisions, which are applicable in this case.

2. The definition and interrelationship of "taxable investment income" and "gain from operations" are discussed in footnote 3 *infra.*

3. To understand why a company would desire to allocate an expense to investment expenses rather than to underwriting expenses, one must analyze I.R.C. § 802 (1982). Section 802 employs two terms of art: taxable investment income and gain from operations. "Gain from operations" is the sum of the company's income from all sources, including income from underwriting (i.e., premiums it received, less claims and underwriting expenses it paid) and investments. See id. § 809. "Taxable investment income" is the net income from investments. See id. § 804.

Section 802(a) imposes corporate income taxes on a life insurance company's "life insurance company taxable income." This figure is calculated in a three-step procedure, the first two of which are relevant to this case. In step one, the company pays taxes on the lesser of taxable investment income or gain from operations. Id. § 802(b)(1). In step two, which only applies if the gain from operations is greater than taxable investment income, the company must also pay taxes on fifty percent of the amount by which the gain from operations exceeds taxable invest-

Liberty National selected the "source of the income" theory for allocation of its profit-sharing contributions. Under this approach, Liberty National allocated its contributions based on the relative profits earned by its investment and underwriting departments. For example, if its investment department earned nine dollars in profit, while its underwriting department only earned one dollar, Liberty National would allocate ninety percent of its profit-sharing contributions to investment expenses and the remainder to operating expenses. Because Liberty National's investment department earned more profits than its underwriting department, most of the company's profit-sharing contributions were allocated to investment expenses, as illustrated by the following table:

| Tax Year | Investment Expenses | Underwriting Expenses |
|---|---|---|
| 1970 | $1,686,432 | $34,155 |
| 1971 | 1,964,551 | 38,317 |
| 1972 | 2,167,427 | 0 |
| 1973 | 2,492,452 | 22,283 |
| 1974 | 2,694,920 | 317,160 |
| 1975 | 2,919,432 | 460,636 |
| 1976 | 3,067,582 | 412,067 |
| 1977 | 7,519,122 | 424,074 |

Thus, by using the "source of the income" allocation method, Liberty National was able to allocate 86 to 100 percent of its profit-sharing contributions to investment expenses.

During an audit, the Commissioner, noting that Liberty National paid only three to four percent of its total salaries and commissions to employees in the investment department, disallowed most of the company's claimed investment expenses. Instead, the Commissioner reallocated Liberty National's expenses based on the relative amounts of salaries and commissions the company paid to its investment and underwriting departments. Based on the "salary" method, the Commissioner allocated Liberty National's profit-sharing contributions as follows:

| Tax Year | Investment Expenses | Underwriting Expenses |
|---|---|---|
| 1970 | $69,152 | $1,693,912 |
| 1971 | 77,626 | 1,940,517 |
| 1972 | 87,735 | 2,079,692 |
| 1973 | 88,720 | 2,426,015 |
| 1974 | 113,525 | 2,898,555 |
| 1975 | 131,924 | 3,248,144 |
| 1976 | 112,045 | 3,367,604 |
| 1977 | 230,670 | 7,712,526 |

In light of these and other adjustments, the Commissioner determined deficiencies against Liberty National for each tax year in question. Liberty National paid the deficiencies, exhausted its administrative remedies, and filed this suit for a refund. Following a bench trial in which both parties introduced expert testimony on the allocation question, the district court held that the Commissioner erred in rejecting Liberty National's allocation method. Because the company's profits are the "source and cause" of the profit-sharing contributions, the court concluded that the contributions are properly allocated based on the relative

ment income. *Id.* § 802(b)(2). If, on the other hand, the gain from operations is less than the taxable investment income, only the gain from operations is included in "life insurance company taxable income." *See id.* § 802(b)(1).

Thus, at least in cases where the company's total gain from operations exceeds its taxable investment income, all of its investment income is taxed, but only fifty percent of the excess of operating income over taxable investment income is subject to tax (in the year in which the income is generated, as opposed to a subsequent year). A company seeking to minimize its tax liability would accordingly allocate as much as possible of a general expense to investment expenses, which are deducted in calculating taxable investment income. *See id.* § 804(c)(1). On the other hand, it would desire to allocate less of its general expenses to underwriting expenses, which are deducted in calculating operating income. *See id.* § 809(d)(11). For in-

stance, one additional dollar in investment expenses reduces both taxable investment income and "life insurance company taxable income" by one dollar; the marginal effect of one additional dollar in underwriting expenses is to reduce operating income by one dollar, but to reduce total taxable income by only fifty cents.

In the case of a company whose taxable investment income is greater than its total gain from operations (meaning that the company sustained an underwriting loss), its "life insurance company taxable income" is simply its gain from operations. In this scenario, the company does not appear to obtain a tax advantage from the allocation of an expense to the investment side of the business, because step two of the section 802(b) calculation does not apply and all of its profits are taxed at the same rate. This scenario only occurs, however, if the company's underwriting activities produce a net loss.

profits generated by the investment and underwriting departments. The Commissioner then appealed.

### B.

"Investment expenses for the taxable year," including general expenses "in part assigned to or included in the investment expenses," are deductible from gross investment income pursuant to I.R.C. § 804(c)(1) (1982). Treasury Regulations define investment expenses as those expenses that are "fairly chargeable against gross investment income," such as salaries paid to employees whose sole responsibility is to oversee the company's investments. Treas.Reg. § 1.804–4(b)(1)(i) (1985).[4] The regulations also provide guidelines for the allocation of general expenses to investment expenses:

> As used in section 804(c)(1), the term "general expenses" means any expense paid or incurred *for the benefit* of more than one department of the company rather than for the benefit of a particular department thereof. For example, if real estate taxes, depreciation, or other expenses attributable to office space owned by the company and utilized by it in connection with its investment function are assigned to investment expenses, such items shall be deductible as general expenses assigned to or included in investment expenses .... Similarly, if an expense, such as a salary, is attributable to more than one department, including the investment department, such expense may be properly allocated among these departments. If such expenses are allocated, the amount properly allocable to the investment department shall be deductible as general expenses assigned to or included in investment expenses....

*Id.* § 1.804–4(b)(1)(ii) (emphasis added).

In this case, both parties agree that Liberty National's profit-sharing contributions are general expenses. Their dispute concerns the method Liberty National selected to allocate its contributions. Liberty National contends that a general expense can be deducted from gross investment income if it is "reasonably direct and reasonably susceptible of allocation" to the investment department. *Northwestern Mut. Life Ins. Co. v. United States,* 7 Cl.Ct. 501 (1985) (citing *New World Life Ins. Co. v. United States,* 26 F.Supp. 444, 458–59, 88 Ct.Cl. 405 (1939), *aff'd per curiam,* 311 U.S. 620, 61 S.Ct. 314, 85 L.Ed. 393 (1940)), *aff'd,* 795 F.2d 74 (Fed.Cir.1986). The Commissioner, on the other hand, contends that the proper standard was stated in *Union Central Life Ins. Co. v. Commissioner,* 720 F.2d 420, 423 (6th Cir.1983) ("[F]or general expenses to be deductible under § 804(c)(1), they must be directly related to the production of investment income."); alternatively, the Commissioner argues that Liberty National's allocation method is improper as a matter of law under either standard.

We conclude that Liberty National's application of the "source of the income" theory to allocate profit-sharing contributions is improper under either standard.[5] Under the Internal Revenue Code and Treasury Regulations, Liberty National's and the district court's reliance on profit as the "source and cause" of the profit-sharing contributions is erroneous. Although it is true that Liberty National's profits were the "source" of its contributions (i.e., the contributions were paid out of its profits), this fact is not controlling. Rather, it is the nature and use of the contributions that determine its tax treatment. *See* Treas.Reg. § 1.804–4(b)(1)(ii) (1985) (focusing on department receiving "benefit" of general expenses); *see also id.* § 1.804–4(a) ("[E]xpenses are deductible only to the extent that they relate to investment income ...."). For example, Liberty National could not deduct the cost of a corporate gift simply because the "source" of its funds was corporate profits. Nor could it deduct the cost of personal telephone calls

---

**4.** In 1986, the Treasury Department substantially revised the regulations governing taxation of life insurance companies to reflect the Tax Reform Act of 1984. Unless otherwise noted, all citations to the regulations refer to the 1985 regulations in place before the revision.

**5.** Accordingly, we need not decide which standard is appropriate.

made by its employees simply because it paid both business and personal telephone expenses out of corporate funds.

■ Liberty National emphasizes that the amount of its profit-sharing expenses depended on the profits it generated in each year. The mere fact that Liberty National gauged its payments by reference to profits does not change the economic nature of the payments. *See Liberty Life Ins. Co. v. United States,* 594 F.2d 21, 25 (4th Cir.) (method of calculating commissions is not determinative of tax treatment), *cert. denied,* 444 U.S. 838, 100 S.Ct. 74, 62 L.Ed.2d 49 (1979). An annual bonus based on company profits, for instance, is still a form of compensation for services rendered. Thus, a proper allocation system for general expenses under section 804(c)(1) must recognize the nature and use of the expenses, not simply the source of the funds.[6]

■ The undisputed facts of this case establish that Liberty National's profit-sharing contributions were a form of deferred compensation. According to the Treasury Regulations, "[c]ontributions [for profit-sharing plans] may ... be deducted ... only to the extent that they are ordinary and necessary expenses during the taxable year in carrying on the trade or business or for the production of income *and are compensation for personal services actually rendered.*" Treas.Reg. § 1.404(a)–1(b) (1985) (emphasis added). *See generally* I.R.C. § 404(a) (1982 & Supp. III 1985) (describing circumstances in which employer contributions to profit-sharing plans are deductible expenses). Because Liberty National's profit-sharing expenses are compensation, the expenses must be allocated in the same manner as is any other compensation deduction—based on the type of work performed by the

employees receiving the compensation. *See Liberty Life,* 594 F.2d at 24–25.

■ Liberty National's "source of the income" allocation method is unacceptable because it does not recognize the compensatory nature and use of the company's contributions. The company's methodology allocates 86 to 100 percent of its contributions to investment expenses even though only three to four percent of its total salaries and commissions are paid to employees in the investment department. The Commissioner's "salary" method, on the other hand, approximates the optimal allocation of Liberty National's profit-sharing expenses. Ideally, those expenses would be apportioned based on the actual payments the company made to the employee profit-sharing accounts, which depend on each employee's annual compensation and seniority.[7] Although the Commissioner's approach does not account for possible differences in the relative seniority of investment or underwriting employees, it is based on the annual compensation paid to employees in each department. Given that the Commissioner has broad discretion to determine whether a taxpayer's accounting methods clearly reflect income, *see Ferrill v. Commissioner,* 684 F.2d 261, 263 (3rd Cir.1982); *Burck v. Commissioner,* 533 F.2d 768, 772–73 (2d Cir.1976), we find that the Commissioner properly rejected Liberty National's "source of the income" theory and reallocated the company's profit-sharing expenses based on its "salary" approach. Accordingly, the district court's judgment on the claim involving allocation of profit sharing expenses is reversed.

## II.

■ Liberty National's cross-appeal concerns discounts it gave to its customers for prepayment of premiums. For decades,

6. Under a system in which the source of the funds is determinative, a taxpayer could designate all or most of its compensation in terms of profits and thus allocate all or most of its compensation expenses to investment income, even though most of its compensation is paid to employees in the underwriting department. This system would distort the company's actual taxable income.

7. The employer contributions in the Liberty National profit-sharing plan are apportioned based on each employee's contribution to the plan and on his seniority. Because the employee contribution is three percent of his annual compensation, the determinative factors are his annual compensation and his seniority.

Liberty National has given its customers a five percent discount on premiums paid twenty-six weeks in advance, and a ten percent discount for premiums paid at least fifty-two weeks in advance. In a case before the former Fifth Circuit involving prior tax years, Liberty National contended that these discounts were fully deductible "discounts in the nature of interest" under I.R.C. § 805(e)(3) (1982). *Liberty Nat'l Life Ins. Co. v. United States,* 600 F.2d 1106 (5th Cir.1979), *cert. denied,* 444 U.S. 1072, 100 S.Ct. 1017, 62 L.Ed.2d 754 (1980) (*Liberty National I*).[8] The court rejected this contention because of the large size of the discount, *id.* at 1112–13 & n. 7 (effective rate of interest would be twenty-four percent), and because of the company's treatment of the discounts, *id.* at 1113–14 (company did not file form 1099, reporting to the IRS its payment of interest to policyholders, and did not "gross up" premiums on its own tax returns to include the discount). The court expressly left open the question whether some portion of the discount should be attributable to interest. *Id.* at 1115 (declining to consider this issue because it was not raised by Liberty National).

The issue left open in *Liberty National I* is now presented to this court as to the tax years 1970 to 1977. At trial, Liberty National contended that a portion of the premium discounts should be deemed "discounts in the nature of interest" under section 805(e)(3). The Commissioner, on the other hand, argued that on the facts of this case section 805(e)(3) did not permit Liberty National to deduct any portion of the discount. After considering extensive evidence, the district court held that Liberty National failed to meet its burden of proving that any portion of the discount should be deductible. The court based its conclusion on several facts: (1) as in *Liberty National I,* the company did not advise its policyholders that any of the discount constituted interest; (2) the company also continued its practice of not filing form 1099 interest disclosures, although the ac-

tual amount of interest paid to any single policyholder may not have been high enough to warrant disclosure, *see* I.R.C. § 6049 (1982) (interest payments of ten dollars or more must be reported to the IRS); (3) the company's refund procedure for cancelled policies did not provide for interest on advance payments of premiums; (4) the discount simply reflected a lower price for a different mode of payment; and (5) the company's purpose in granting discounts was to retain the goodwill of long-time policyholders and to engage in price competition with other companies.

As noted in *Liberty National I,* 600 F.2d at 1111 n. 6 (citation omitted) (emphasis added), "[a]lthough the ultimate issue of whether the discounts were in the nature of interest is one of law, the underlying issue *why* [the] taxpayer granted the discount is factual and subject to the clearly erroneous rule on review." On the facts of this case, the district court's conclusion that no portion of Liberty National's discounts was intended to serve as interest is not clearly erroneous.

In reaching this conclusion, we recognize that an interest component can arguably be found in any payment over a period of time. The United States Court of Appeals for the Fourth Circuit disposed of this argument with the following discussion:

> There is no doubt that an element of interest was included in the discounts given to the associations [that marketed the company's insurance policies], but that fact aids [the taxpayer's] case very little. All insurance premiums are "paid in advance" in the sense that they are generally received by the company at the period of the beginning of the coverage. On ordinary life insurance policies, the policyholder may elect to make payments at more frequent intervals than once a year, but he is usually charged slightly more for the privilege of spreading out the payments. This surcharge does not convert the difference between the total of the frequent payments and the

**8.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

amount of the single annual payment into an interest discount. Surely, the Congress intended to require something more than this in order to permit the deduction authorized by section 805(e)(3). We think that this section of the Code deals with special situations and requires a showing that some further interest benefit is offered by the insurance company for genuine advance deposits.

*Liberty Life Ins. Co. v. United States,* 594 F.2d 21, 28 (4th Cir.), *cert. denied,* 444 U.S. 838, 100 S.Ct. 74, 62 L.Ed.2d 49 (1979).

Although we might have accorded different weight to some of the factors upon which the district court relied, its conclusion that Liberty National's discounts were given to maintain the company's competitiveness and policyholder goodwill is supported by the evidence. Particularly persuasive is the undisputed fact that Liberty National has been granting the same discounts since 1944,[9] despite the wide fluctuation in interest rates in the post-World War II era. Moreover, companies grant discounts for many reasons that would not justify a section 805(e)(3) deduction, such as maintenance of goodwill, price competition, and recognition of lower administrative costs. *See* Treas.Reg. § 1.805–8(b)(2) (1985) ("Amounts in the nature of interest do not include amounts derived from or representing mortality gains, expense savings, underwriting profits, or other items not in the nature of interest."). Accordingly, that portion of the district court's judgment rejecting Liberty National's claim for a section 805(e)(3) deduction is affirmed.

AFFIRMED in part and REVERSED in part.

---

**9.** Liberty National adopted the discount policy from Brown-Service Insurance Company, with which it merged in 1944. The history of this discount policy is recounted in *Liberty National I,* 600 F.2d at 1107–08.