The OHIO NATIONAL LIFE
INSURANCE COMPANY,
Plaintiff,

v.

The UNITED STATES, Defendant.*

No. 130–82T.

United States Claims Court.

April 11, 1986.

## ORDER

WIESE, Judge.

(i) Granting Defendant's Motion for
Summary Judgment

and

(ii) Directing Dismissal of Complaint

This is a suit for refund of $471,172 in federal income taxes and assessed interest for the years 1974 and 1975. The matter in dispute, presented here through cross-motions for summary judgment, concerns the

* Editor's Note: Although originally an unpublished order, publication is now being made in view of the Court of Appeals' affirmance on the basis of this opinion, 807 F.2d 1577.

proper tax treatment for certain expenses associated with plaintiff's life insurance business. Specifically, the question is whether amounts plaintiff paid for state franchise taxes, state audit examination fees and policy renewal commissions are chargeable, in part, against gross investment income and, hence, deductible as "investment expenses" under § 804(c)(1) of the Tax Code (as plaintiff contends) or are assignable in their entirety to the computation of so-called "gain or loss from operations", hence qualifying only as "other deductions" under § 809(d)(11) (as the Government contends).

Based upon the facts enumerated below, the parties' briefs, and their oral presentations of February 19, 1986 and March 4, 1986, the court has concluded that the Government is entitled to judgment in its favor on all issues in the case.

## I.

*Franchise Tax*

1. During the years in suit (1974 and 1975), Ohio law required plaintiff to pay an annual franchise tax on the privilege of being an insurance company. Ohio Rev. Code.Ann. §§ 5725.18, 5725.19 (Page 1980). The tax is computed on the basis of the smaller of: (i) two and one-half percent of the gross amount of premiums received from policies covering risks within the state during the preceding calendar year, or, (ii) three-tenths of one percent of the company's capital and surplus as reported in its annual statement for the preceding year. Plaintiff computed its franchise tax liability under the latter option for each of the years in issue.

2. For federal income tax purposes, in computing "investment yield" and "taxable investment income" pursuant to § 804 of the Tax Code, plaintiff allocated a portion of the franchise tax paid to its investment department operations and deducted this amount on its federal income tax returns as an investment expense. The allocation was based on the ratio of plaintiff's gross investment income to total gross income.

3. Plaintiff paid a franchise tax of $106,344 in 1974 and $111,276 in 1975. Of these amounts, $35,115 and $36,922 were treated as general expenses chargeable as investment expenses in the respective years. Plaintiff premised this allocation on the position that, since the franchise tax is a tax paid for the privilege of being able to operate as an insurance company, it is, therefore, a tax properly chargeable to an insurance company's two major business sectors—underwriting and investing.

4. On audit, the Internal Revenue Service disallowed the deduction of the franchise taxes as investment expenses under § 804(c)(1) but permitted their deduction in the computation of the "gain or loss from operations" under § 809 of the Code.

5. The Government's disapproval of plaintiff's allocation to investment expenses of a portion of its franchise taxes rests on two main grounds. First, the Government relies upon the decision in *Union Central Life Insurance Co. v. Commissioner,* 720 F.2d 420 (6th Cir.1983), where it was held that, in order for a general expense (meaning an expense paid or incurred for the benefit of more than one department) to qualify for inclusion as an investment expense under § 804(c)(1), the expense must be "directly related to the production of investment income." *Id.* at 423. To qualify under this standard—says the Government—the tax must be one that was imposed upon plaintiff's investment assets or upon the income produced by such assets. Since the Ohio franchise tax was imposed upon plaintiff's capital and surplus—in effect the residuum of its underwriting and investment activities— the Government maintains that the tax is too remotely associated with the production of investment income and therefore not an investment expense.

6. The Government's other argument is essentially a restatement of its primary contention, though phrased in different terms. The argument relies upon the language of Treas.Reg. § 1.804–4(b)(1)(i) (1985) which defines the term "investment expenses" to mean "those expenses of the

taxable year which are fairly chargeable against gross investment income." The contention is that the franchise tax does not come within the compass of the regulation because it is a tax that is assessed against a net income base, *i.e.*, the company's net worth; by definition then, it is not an expense chargeable against *gross* income.

7. In deciding this issue, the court notes at the start that the statutory provision in question, 26 U.S.C. § 804(c)(1), contains no definition or qualifying words respecting the type of general expense that may qualify for deduction as an investment expense. The statute says only that in determining "investment yield", deductions are permitted for "investment expenses" and, subject to certain limitations, "general expenses * * * in part assigned to or included in the investment expenses".

8. The statute's legislative history too offers little guidance for, judging from the parties' briefs, the issue was not examined in any depth. The little that was said on the subject, however, does favor the Government's position. During the committee hearings Dr. T.S. Adams, the Treasury official who was primarily responsible for the Revenue Act of 1921 (the legislation whose taxing scheme is embodied in the Code sections of concern here), was called upon to explain why a state tax on the privilege of doing business as an insurance company would not be deductible under the contemplated legislation. He answered:

> We are not taxing or touching their premium income. The hundreds of millions of dollars which they collect as premiums we are not looking at. The collection of those premiums constitutes their main business which they are doing among themselves, and so far as their expenses go to that nontaxable end of their business those expenses we are not concerned with.
>
> Every State insurance law, for instance, sets aside a certain amount of each premium collected as expenditures for collecting it. The agents' commissions, taxes imposed by the State on pre-

miums, belong to that nontaxable end of their business. We do not tax the receipt of the premium income. Consequently, we ought not to permit deduction of the expenses that go along with that. On the other hand, they are great investment agencies investing money. That interest which comes in ought to be taxed. The expenses which may clearly be assigned to that end of the business should be deducted. [Hearings on H.R. 8245 Before the Senate Committee on Finance, 67th Cong., 1st Sess. 83, 90 (1921).]

Dr. Adams' answer, though perhaps not a straightforward one, still leaves it clear that since the statute imposed no tax on the income derived from an insurance company's main source of income—its premiums—so neither then should a state tax levied on the privilege of conducting that business be allowed as a deduction. Rather, as Dr. Adams explained only "[t]he expenses which may clearly be assigned to * * * [the investment] end of the business should be deducted."

9. The chief authority for understanding the nature of the general expenses that may qualify as investment expenses under the statute is the early but still controlling decision of the Court of Claims in *New World Life Insurance Co. v. United States*, 88 Ct.Cl. 405, 26 F.Supp. 444 (1939), *aff'd per curiam*, 311 U.S. 620, 61 S.Ct. 314, 85 L.Ed. 393 (1940). In that case the court, in speaking of the type of general expenses that might qualify for deduction as investment expenses under § 203(a)(5) of the Revenue Act of 1928 (the statutory predecessor to § 804) said as follows:

> * * * the section under consideration seems further to have contemplated * * that certain general expenses of the insurance company might, with some degree of reasonableness, be said to have some direct relationship to the investment department and also to be reasonably susceptible of division and assignment in part to the different departments

of the business. [*Id.* 88 Ct.Cl. at 435, 26 F.Supp. at 459.]

10. According to the *New World* decision, a general expense may qualify for inclusion under § 804(c)(1), *i.e.*, be chargeable as an investment expense, if, reasonably considered, the expense (i) bears some *direct* relationship to the investment department, and (ii) is reasonably susceptible to division and allocation to the benefiting departments.

It was on the basis of the language from the *New World* decision that the Sixth Circuit reached the conclusion expressed in the *Union Central* decision: "that for general expenses to be deductible under § 804(c)(1), they must be directly related to the production of investment income." *Union Central Life Insurance Co. v. Commissioner*, 720 F.2d 420, 423 (6th Cir. 1983).

11. This court reads the decision in *Union Central* as being essentially synonymous with the standard articulated in the *New World* decision. And both decisions can be said to offer more particularized expressions of the general definition for investment expenses stated in Treas.Reg. § 1.804-4(b)(1)(i): "those expenses of the taxable year which are fairly chargeable against gross investment income."

■ Taken collectively, these authorities confine the deduction of general expenses permitted under § 804(c)(1) to those general expenses that bear a *causal* connection with investment income, *i.e.*, those particular costs which, though pooled under the heading of a general expense, owe their existence entirely to the activities of the investment department. Under this standard, any portion of a general expense that is identifiable with a corporate resource (financial, physical, or human) that assists in or is utilized in the immediate activity of producing investment income would qualify for deduction. But absent an immediate connection to investment activity, the general expense must be deemed too remote to satisfy the "direct relationship" requirement of the *New World* decision.

■ 12. Pursuant to the criterion for deductibility specified in Paragraph 11, the court concludes that plaintiff may not claim a share of its franchise taxes as an investment expense. Though the payment of this tax is essential to maintaining the right to conduct an insurance business (and, hence, to engage in insurance-related investment activity), nevertheless, it is not a cost the immediate occasion of which was the generation of investment income. This being so, the franchise tax can only be said to bear an indirect relationship to investment income; thus, it is not an "investment expense" within the meaning of § 804(c)(1).

*State Examination Fees*

13. During the years in suit, Ohio law required the superintendent of insurance or a person appointed by him to make an examination of the affairs of "any insurance company doing business" in the State of Ohio as often as he deemed it expedient "for the protection of the interests of the people of this state", but not less frequently than once each three years. Ohio Rev. Code Ann. § 3901.07 (Page 1971). The statute further requires that if examination is made of an Ohio domestic insurance company, the expense of the examination shall be paid by the company.

14. Pursuant to § 3901.07, an examination was to be conducted during 1975 of the records, affairs, and financial condition of Ohio National Life Insurance Company for the three year period 1972, 1973, and 1974. For federal income tax purposes, in computing investment yield and taxable investment income pursuant to § 804 of the Tax Code, plaintiff, in 1974, allocated a portion of the examination fee expense ($17,000) that it estimated it would incur in connection with the 1975 examination. Similarly, in 1975, plaintiff allocated a portion of the examination fees it expected to incur in consequence of the triennial examination scheduled for 1978, plus a portion of an amount ($9,644) incurred with respect to the 1975 examination.

15. For the years 1974 and 1975, the total amounts attributed to examination

fees came to $17,000 and $30,644 respectively. Of these amounts, plaintiff claimed $12,988 was properly allocable to 1974 investment expense; for 1975, plaintiff claimed $10,168 as an investment expense. These allocations reflect the proportion of the total time spent by the examining agents in reviewing plaintiff's investment policies and investment accounts.

16. The basis for plaintiff's allocation of a portion of its state examination fees to investment expense is its contention that, since the examination was a necessary condition to the conduct of the company's business activities ·in the state (including, by definition, investment activities), therefore, a share of the fees associated with that examination were properly chargeable against the income generated by those investment activities.

17. On audit, the Internal Revenue Service disallowed the portions of the examination fees which plaintiff had claimed as investment expense deductions pursuant to § 804(c)(1) but allowed their deduction in the computation of gain or loss from operations under § 809 of the Code.

18. The Government's disallowance of the taxpayer's treatment of a portion of its state examination fees as investment expenses rests on the same ground that is urged with respect to the franchise tax issue, namely, that a general expense may qualify as a deductible, investment-related expenditure under § 804(c)(1) only if such expense is directly related to the production of investment income. Under the Government's view, the examination fee was not directly incurred in the production of investment income, hence its deduction as an investment expense was not authorized.

19. The court agrees with the Government's position. The state examination fees relating to the examination of plaintiff's investments and investment-related activities are administrative expenses associated with an overall examination of the company's compliance with state regulatory requirements. The fact that the examination thus includes an inspection of plaintiff's investment portfolio and activities does not mean that a portion of the examination fee may be charged to investment income. Again, the deciding point is whether the cost that is incurred arises in the context of an investment-centered activity or transaction. If it does not, then the cost may not be claimed as an investment expense. That is the case here, and the examination fees do not qualify for deduction as investment expenses.

*Renewal Commissions*

20. During the years 1974 and 1975, plaintiff sold insurance and annuity policies through a general agency system, *i.e.*, a field organization consisting of general agents, producer agents, and other field representatives.

21. Plaintiff entered into a contract with each of its sales agents, specifying the duties of the agent, his responsibilities, the limitations of his authority, the agent's relationship to the plaintiff, and the compensation to be paid.

22. The general agent's duties under the agency contract are of three types: (i) recruiting, training, and supervision of producing agents, (ii) production of insurance (*i.e.*, soliciting applications for insurance, delivering policies to insureds, and collecting the initial premium for such policies), and, (iii) servicing and assisting in the settlement of all policies.

23. The compensation under the contract is directly tied to each of these three classes of duties. The general agent is separately compensated for the agency building, for personal production and for servicing policies.

24. All of the compensation paid for the agency building and personal production is at least partially vested at the time the insurance sale is made, *i.e.*, so long as the policy remains in force, compensation to the agent shall continue even though the agency contract is terminated or the policy is reassigned to another area. In other words, none of the compensation paid for the agency building or personal production

is transferable to a new general agent even if the policy is reassigned to that agent for servicing.

25. The compensation paid for servicing is referred to as a "renewal expense allowance". The renewal expense allowance is transferable, *i.e.*, it is payable to the servicing agent of record.

26. The producer agent's duties under the producer agent contract include: (i) soliciting and completing applications for policies of individual and family-group life insurance, health insurance, and annuities; and transmitting such applications to the home office, (ii) personally delivering policies to the company's insureds and collecting the initial premiums, and, (iii) servicing the company's policies in the territory in which he has been appointed irrespective of whether or not he was the policy-originating producer.

27. The producer agent contract provides for five separate types of compensation (*i.e.*, variously named commissions and bonuses), three of which are fully vested and two partially vested.

28. Among the types of compensation paid the producer agent (and also the general agent) are so-called renewal commissions, which are fully vested commissions paid to the policy-originating agent based upon an insured's annual renewal premium. Except for certain of plaintiff's insurance policies (such as health, retirement annuities, and whole life), renewal commissions are not paid after the seventh policy year.

29. Being fully vested, renewal commissions are paid to the agent through whose efforts the policy originated and not to the agent who may be servicing the policy at the time of its renewal.

30. Although entitlement to the renewal commission is tied to the agent through whose efforts the policy was produced and not the servicing agent, plaintiff maintains that its renewal commissions are attributable to agent servicing activities rather than sales activities. Further, it maintains that of the total time an agent devotes to policy servicing activities, 16.49 percent is given over to the servicing of policy loans.

31. Under Ohio law, plaintiff was required to include policy loan provisions in its individual life insurance policies (other than term insurance) during each of the years in issue.

32. Plaintiff makes two types of loans to policy holders pursuant to the loan provisions in its policies: policy loans and automatic premium loans. The latter are loans automatically made by the home office pursuant to policy provisions (elected by the insured) that apply when premiums are overdue. Policy loans, also called certificate loans, refer to cash advances made to or in behalf of the policy holder.

33. Loans under an insurance policy, whether automatic premium loans or certificate loans, are advances against the cash value of the policy. Hence, they are fully secured loans.

34. Policy loans have a premium conservation aspect that is not present in other kinds of loans. Through policy loans, the company retains policies that would otherwise be surrendered by the policyholder to obtain the cash value. Policy loans are also unusual because their attractive interest rates make them a sales tool.

35. The only policies of the plaintiff that were eligible for policy loans were ordinary life policies (excluding term insurance) and annuities.

36. Of the total number of policies containing provisions for policy loans, approximately 15 percent had policy loans in force on December 31, 1974 and December 31, 1975.

37. The total policy loan interest accrued by plaintiff for the years 1974 and 1975 came to, respectively, $2,281,343 and $2,514,560.

38. The income earned by plaintiff from its policy loan interest was considered investment income for annual statement and federal income tax purposes. There is no dispute between the parties concerning this characterization of plaintiff's interest income.

39. As noted in paragraph 30, plaintiff maintains that its renewal commissions represent compensation for policy servicing activities (rather than policy sales activities) and that 16.49 percent of such servicing activity was devoted to policy loans. On this basis then, plaintiff allocated to investment expense in 1974 renewal commissions in the amount of $403,117 (out of a total renewal commission expenditure of approximately $2.4 million); in 1975, the allocation came to $422,697 (out of a total renewal commission expenditure of $2.7 million). It is these allocations which are the matter in dispute here.

40. Plaintiff justifies the allocation on the ground that since the loan servicing activity generated investment income (i.e., interest), it is both logical and appropriate to charge a relevant portion of the cost of that activity to the income thereby produced, that is, to charge a portion of renewal commissions as investment expenses.

41. In challenging this tax treatment of renewal commissions, the Government argues that plaintiff has adopted an allocation scheme that has no grounding in the compensation scheme reflected in its agents' contracts, is offensive to settled industry accounting standards, and, in like fashion, contravenes the equally settled view that agents' commissions are costs of earning premium income and not investment income. The Government is correct on each of these grounds; we need discuss here only the first mentioned.

42. A complete obstacle to accepting plaintiff's characterization of a portion of its renewal commissions as investment expenses is the language of the contracts between the company and its agents. These contracts—both the General Agent Contract and the Producer Agent Contract—leave little doubt that renewal commissions are intended as compensation for policy sales and not policy servicing.

(a) Consider first the General Agent Contract. This contract contains a Section VI, titled "Compensation", which specifically identifies renewal commissions as "compensation for personal production" and re-lates the payment of these commissions exclusively to "premiums * * * paid to and accepted by the Company". Additionally, the contract provides a separate form of compensation, a so-called "renewal expense allowance", under the separate subheading of "Compensation for Servicing of Policies of Agency". Finally, in the event the company has occasion to refund a premium on a policy produced under the contract, the contract correspondingly obliges the agent to "repay to the Company on demand, any commissions or other compensation paid to the General Agent which was based on the premium or premiums so refunded * * *." Considering these several provisions, there is no valid case to be made here for the proposition that the renewal commission represents, in part, compensation for policy loan servicing activities. The compensation scheme set out in the General Agent contract flatly contradicts such a proposition.

(b) So far as the Producer Agent Contract is concerned, the case is much the same. Here too the contract's compensation provisions tie the renewal commission to policies "produced" under the contract—this as manifested by premiums "paid to and accepted by the Company". And like the general agent, the producer agent too is contractually bound to restore to the company the amount of any commission paid upon a premium which the company subsequently refunds. Moreover, the producer agent, though he receives no separate monetary consideration for any policy servicing activities he may perform, nevertheless is contractually compensated for such activities in the form of certain benefits and privileges including various forms of insurance (health, accident and life) and pension plan eligibility. Fairly read then, the Producer Agent contract is as inhospitable to plaintiff's attempt to apportion the renewal commission between production activities and investment activities as is the General Agent contract.

(c) Taking the words of these contracts to mean what they say (and no credible reason is given to do otherwise) it is clear that the renewal commission is linked

exclusively to policy sales. The commission is earned upon the company's receipt of the premium and, similarly, the commission must be relinquished should the premium on which it was paid be refunded by the company. In this compensation format, the occurrence or not of policy servicing activities, including policy loan activities, is wholly irrelevant to the agent's right to the commission or his obligation to return it. Plaintiff's attempt to say otherwise is thus totally artificial when examined in the light of the parties' contractual rights and duties. The court therefore rejects the argument.

43. In reaching the conclusion expressed above (paragraph 42(c)), the court has given careful attention to the several agents' affidavits that plaintiff relies upon. Though variously worded, the affidavits say, in substance, that servicing functions (including the servicing of policy loans) comprise an important and expected part of an agent's duties, the compensation for which is included in the commissions received. Plaintiff sees these affidavits as providing full factual support for its position that a portion of the renewal commission is properly chargeable as an investment expense.

The affidavits cannot help plaintiff's position. Taking all that they say as true, they still cannot change the outcome. What alone matters here is that, by the terms of the contracts which define the legal relationship between the company and its agents, the renewal commissions are tied *exclusively* to the company's receipt of and its retention of a renewal premium. Servicing activities may well be vital to securing and retaining that premium, but the performance of those activities is *not* the contractually-designated compensable event. The parties are bound by their contract language and that language dictates that the renewal commission be treated as an underwriting expense and not as an investment expense. The affidavits' attempts to say otherwise create no genuine issue of material fact that would stand as a bar to the granting of the Government's motion; at best, those affidavits offer nothing more than plainly erroneous interpretations of unambiguous contract language.

## II.

For the reasons set forth herein, defendant's motion for summary judgment is granted and plaintiff's cross-motion is denied. The Clerk shall enter judgment dismissing the complaint. Costs shall not be assessed.