**PRINCIPAL MUTUAL LIFE INSURANCE COMPANY,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

**No. 486–87T.**

United States Claims Court.

June 30, 1992.

618

Bruce Graves, Des Moines, Iowa, for plaintiff. Harold N. Schneebeck, was of counsel.

Robert C. Markham, Washington, D.C., with whom was Mildred L. Seidman, Michael J. Dennis, Dept. of Justice, Tax Div., and Shirley D. Peterson, Asst. Atty. Gen.

## OPINION

SMITH, Chief Judge.

This case involves a tax refund claim by plaintiff Principal Mutual Life Insurance Company (Principal). Plaintiff seeks recovery of federal income taxes and interest for assessments paid in tax years 1977 and 1978. This opinion addresses the parties' cross motions for summary judgment and several related procedural motions. After careful consideration of the briefs filed by the parties and after oral argument, the court grants plaintiff's motion as it applies to the (1) waiver of premium benefits, (2) monthly payments from life insurance, (3) advertising expenses, and (4) state examination fees issues and grants defendant's motion as it applies to the (1) monthly income pursuant to accident and health insurance and (2) agents' debit balances issues.

## FACTS

Principal[1] is a mutual insurance corporation organized and existing under the laws

1. Prior to July 1, 1986, Principal's corporate name was Bankers Life Company.

of the state of Iowa. Its primary business is writing various forms of life and health insurance. The issues in dispute involve Principal's tax liability for tax years 1977 and 1978.[2] During those two years, Principal treated various state-mandated reserves as being deductible from its income. Reserves are established by insurance companies to set aside sufficient funds to cover anticipated liabilities under various insurance policies. States mandate the establishment of reserves to protect the policyholders and to ensure the solvency of insurance companies. The amount of funds placed in reserves is determined on the basis of recognized mortality and morbidity tables with assumed rates of interest.

Also during the tax years in dispute, Principal deducted from its income the costs of various advertising expenses and state examination fees. Principal also excluded money advances made to its agents in its calculation of its taxable investment income. All of the deductions and the omission of the money advances from reported taxable investment income had the effect of lowering Principal's taxable income in 1977 and 1978.

In August 1981, based on the above deductions and omissions from income, the IRS assessed an income tax deficiency against Principal for tax year 1977 in the amount of $2,486,917.33 (which included $566,685.62 in interest) and for tax year 1978 in the amount of $3,678,350.01 (which included $702,392.25 in interest). Principal paid these assessments in 1981. In August 1983, Principal filed a claim with the IRS for a refund of the deficiency assessments made against it for 1977 and 1978. The claim also demanded a refund of a portion of the deficiency interest assessed and collected by the IRS. In November 1985, the IRS sent notice of partial disallowance, stating that $783,838.42 of Principal's claim had been disallowed for 1977 and $1,369,-700.32 for 1978. On August 13, 1987, Principal filed suit in this court seeking a refund of $756,770.26, plus $223,267.41 in deficiency interest, for 1977 and a refund

of $1,337,706.98, plus $315,728.78 in deficiency interest, for 1978.

I. Disabled Lives Reserves

During 1977 and 1978, Principal had in force certain group insurance policies which were typically issued to employers as the group policyholder. The policies obligated Principal to provide insurance coverage for renewable one year terms for employees who were actively employed by the group policyholder. Employees covered by such policies were generally referred to as "active employees" or "active lives." Principal was not obligated to renew any of these policies. Principal reserved the right to discontinue the policies in their entirety by giving 31 days' notice to the group policyholder on the day immediately preceding the policy anniversary. Principal was also not obligated to renew any of these policies at a specified premium rate. Principal reserved the right to change the premium charged on an annual basis.

Under many of these group policies, Principal was also obligated to provide other benefits to employees who became "totally and permanently disabled" while insured under the contract. These typically included a waiver of premium benefit and a monthly income for life (or a specified period of time) benefit. To be considered "totally and permanently disabled," and therefore eligible for such benefits, insured employees had to satisfy several conditions, including demonstration of disability. Employees satisfying conditions under these group policies were generally referred to as "disabled employees" or "disabled lives."

Employers holding Principal's group policies were responsible for the payment of premiums. The active and disabled employees insured under the policies were not the policyholders and had no obligation to Principal to pay the policy premium for the insurance or the benefits. If an employer either cancelled or failed to renew the

2. Principal's tax liability for 1977 and 1978 is controlled by the Life Insurance Company Income Tax Act of 1959, Pub.L. No. 86–69, 73 Stat.

112. The pertinent provisions of the Internal Revenue Code (IRC) of 1954 are found at 26 U.S.C. §§ 801–05 (1982).

group insurance contract or failed to pay the required premium, Principal still had an obligation to provide the benefits specified in the contract to a disabled employee as long as the employee remained disabled. This obligation continued even though Principal was no longer receiving premiums and regardless of the fact that no insurance contract remained in force between Principal and the employer.

Principal kept sufficient funds to cover its obligations at issue here under group policies in one of two types of reserves. The first reserve was an "active lives reserve," which was created for all active employees at the inception of a group policy. The purpose of this reserve was to provide for Principal's estimated future liability for employees disabled during the one-year term a policy was in effect. The second reserve was a "disabled lives reserve," which was created when an employee became totally and permanently disabled under the terms of the policy.[3] The basic purpose of this reserve was to provide for the payment of a death benefit to disabled employees who died while disabled. When a disabled lives reserve was created for an employee, the active lives reserve for that employee was simultaneously eliminated. If the disabled employee later died, Principal would reduce the disabled lives reserve in an amount commensurate with the death benefit paid. Principal would not reduce the overall active lives reserve as the corresponding reserve originally established for the employee had already been eliminated upon disability. If the disabled employee recovered from the disability and went back to work, Principal would cancel the employee's disabled lives reserve and create a new active lives reserve. If after recovering the employee did not return to the employer, Principal would not initiate a new active lives reserve.

The only reserves at issue in this case are the disabled lives reserves. Specifically, there are three types of disabled lives reserves at issue. The first reserve was created pursuant to one category of group life insurance policies issued by Principal.

From this reserve, Principal provided for continuation of an employee's life insurance upon disability during the period of the employee's disability. In effect, Principal paid into this reserve the life insurance premiums for the employee after he or she had become disabled. (Under the group policies in question, employers no longer had to pay premiums for employees after disability had been established.) The second reserve was created pursuant to another category of group life insurance policies issued by Principal. From this reserve, Principal was obligated to make sixty equal monthly payments totalling the face value amount of the employee's life insurance, so long as the employee remained disabled. The third reserve arose under Principal's group accident and health insurance policies. From this reserve, Principal provided monthly income benefits as long as the employee remained disabled.

A more detailed discussion of the three reserves follows.

### A. Waiver of Premium Benefits

Under the group life insurance policies at issue in this case, Principal provided disabled employees a continuation of life insurance coverage without requiring premium payments so long as the employee remained disabled. The extended life insurance would continue without obligation for payment of premium until the date of death or the date of recovery from disability. A few policies decreased the amount of the extended life insurance upon attainment of a specified advanced age, such as age sixty or sixty-five. The majority of policies continued the extended life insurance beyond age sixty-five. In the event of the death of the disabled employee, Principal paid the face value amount of the extended life insurance to the employee's designated beneficiary.

The disabled lives reserve established for this benefit was separately computed for each employee who became disabled. The aggregate amount of this reserve was $27,965,429.00 for 1977 and $32,829,989.00 for 1978.

---

**3.** Principal eliminated the policies and reserves in question after 1978.

### B. Monthly Payments from Life Insurance

Under some of the group life insurance policies at issue in this case, disabled employees were entitled to receive the face value amount of their life insurance payable in sixty equal monthly installments so long as the employee remained disabled throughout that sixty-month period. Principal ceased payment after the sixtieth monthly installment, the date of death, or the date of recovery from disability, whichever occurred first. If the employee died while receiving payment of the monthly installments before the sixtieth installment had been paid, Principal paid the commuted value of the unpaid installments to the employee's designated beneficiary. If a disabled employee who had been receiving monthly installment benefits subsequently recovered, the face value amount of the policy was reduced by the aggregate amount of the installments which had already been paid.

The disabled lives reserve established for this benefit was separately computed for each disabled employee. The aggregate amount of this reserve was $1,100,818.00 for 1977 and $1,316,695.00 for 1978.

### C. Monthly Income Pursuant to Accident and Health Insurance

Under the group accident and health policies at issue in this case, any active employee who became "totally and permanently disabled" during the term of the contract was entitled to receive a specified monthly income benefit until age sixty-five, death, or recovery from the disability, whichever occurred first. Under these policies, Principal was under no obligation to pay any benefit after the death of an employee.

Principal computed separately the disabled lives reserves for this type of policy for each employee who became disabled. The aggregate amount of this reserve was $44,475,492.00 for 1977 and $53,104,956.00 for 1978.

## II. Advertising Expenses

In addition to providing insurance, Principal was a major provider of investment capital during 1977 and 1978. Principal made commercial and residential mortgage loans and loans to large corporations through investment bankers and brokers. To promote its availability to potential borrowers and brokers, Principal annually distributed hundreds of copies of its financial reports throughout the financial community.

Principal claimed deductions for investment related advertising expenses in the amounts of $139,271.50 for 1977 and $180,095.42 for 1978. Principal contends that these figures represent the sum of (1) direct expenses incurred by Principal specifically for the benefit of its investment department and (2) the general advertising costs allocated in part to its investment department. The direct advertising expenses specifically incurred by Principal for the investment department totaled $35,303.22 for 1977 and $41,665.61 for 1978. These expenses included printing and duplicating costs associated with the distribution of Principal's annual report and financial statement to investment bankers and brokers. These expenses also included promotion costs incurred by Principal's investment department for items such as calendars, diaries, attache cases, and pens. The balance of Principal's claimed deduction, $103,968.28 for 1977 and $138,429.81 for 1978, represent the portions of its general institutional advertising expenses which were allocated to investment in accordance with the ratio of Principal's gross investment income to its total income as set forth in IRC § 804(c)(1). That ratio was 23.29% for 1977 and 24.02% for 1978.

## III. State Examination Fees

During the years in dispute, Iowa law required a state examination of the business affairs and financial condition of all domestic insurance companies operating in Iowa. An examination was required at least once for every three-year period. In 1977, a state examination of Principal (then operating as Bankers Life) was conducted for the period encompassing tax years 1973 through 1976. Principal was required to pay fees to the Iowa State Insurance De-

partment to cover the costs of this examination. Principal paid fees in the amount of $65,145.40 in 1977 and $301.00 in 1978.

On its federal income tax returns, Principal claimed a portion of these fees ($42,-344.00 for 1977 and $195.65 for 1978) as deductible investment expenses. On audit, the IRS disallowed these expenses as investment expenses under IRC § 804(c), but allowed their deduction in the computation of gain or loss from operations under § 809. In its claims for refund before the IRS, Principal claimed these amounts as investment expenses. The IRS subsequently allowed these amounts as investment expenses. The government now argues that this allowance was erroneous.

### IV. Agents' Debit Balances

During 1977 and 1978, Principal followed a standard practice in the insurance industry by advancing money to beginning agents in excess of the commissions they were entitled to receive. These advances were charged against the agents' anticipated future commissions, creating what Principal has referred to as "agents' debit balances." These balances represented the excess of the monies paid or advanced to agents under Principal's financing plan over the commissions actually earned by the agents under their contracts. Principal employed this practice to attract prospective agents to the insurance business. The advances enabled new agents to meet their living expenses until their commission income was sufficient to support them.

The terms of the relationship between Principal and new agents were set forth in an agency contract. The contracts provided that Principal would have the right to offset any indebtedness due it from an agent against any commissions due the agent from Principal. In instances where upon termination there were no earned commissions to offset against an agent's balance, the amount of the balance was written off as bad debt.

In 1977 and 1978, Principal treated the cash advances made to its agents as income to the agents. Principal treated these payments as an expense on its federal income tax return and included the agents' debit balances in the total amount of commissions paid for those years. What is at issue is whether Principal properly reported these balances as expenses used in carrying on its insurance business and thereby properly excluded them from the calculation of its taxable income pursuant to § 805(b)(4).[4] In 1977 and 1978, respectively, Principal reported that it paid commissions in the amounts of $44,927,309.00 and $48,512,079.00.

### DISCUSSION

### I. Pending Procedural Motions

#### A. Motion to Amend Partial Motion for Summary Judgment

On July 12, 1989, the government filed its Motion for Partial Summary Judgment, asserting that the court should enter judgment in favor of the government on the three disabled lives reserves issues and the issues relating to advertising expenses and agents' debit balances. On April 6, 1990, the government filed a Motion to Amend its Summary Judgment Motion. In that motion, the government seeks to include in its summary judgment motion the government's first and second affirmative defenses asserted in its January 13, 1988 answer. The first defense involves the agents' debit balances issue and the possible application of the doctrine of collateral estoppel against Principal. The second defense involves the state examination fees issue and

---

**4.** Sections 804 and 805 set forth a two-step process by which to determine an insurance company's taxable investment income. First, ordinary expenses chargeable against investment income (*i.e.* expenses "used in carrying on its insurance business") are deducted from the company's gross investment income. Then the policyholders' share of investment yield (*i.e.* investment income attributable to reserves which the company must maintain under state law to meet future policy obligations) is deducted from that figure, leaving a remainder which is taxable as the company's investment income. Under this scheme, it is obviously in the insurance company's interest to have a large amount of expenses deducted from its investment income as expenses "used in carrying on its insurance business." IRC § 805(b)(4); *Bankers Life Co. v. United States*, 412 F.Supp. 62, 63 (D.Iowa 1976), *aff'd,* 587 F.2d 893 (8th Cir.1978).

the possible application of the Federal Circuit Court of Appeals decision in *Ohio National Life Insurance Co. v. United States,* 11 Cl.Ct. 477, *aff'd,* 807 F.2d 1577 (Fed.Cir.1986) (*per curiam*). The government asserted those defenses in its brief in support of its partial summary judgement motion and raised them at the November 28, 1989 oral argument held on the parties' cross motions. The government, however, failed to actually assert those defenses in its partial summary judgment motion.

Principal maintains that the court should not consider these defenses in deciding the government's motion for partial summary judgment. Principal points out that the government elected to argue only the merits of the agents' debit balances and state examination fee issues in its motion. Principal notes that the government did not seek consideration of the collateral estoppel defense and the application of *Ohio National Life* until it filed its motion to amend, almost a year after the filing of the motion for partial summary judgment. Principal thus contends that these affirmative defenses are not properly before the court.

■ The amending of pleadings is governed by Rule 15(a) of the United States Claims Court. That rule sets forth a permissive standard in regard to the granting of amendments:

> A party *may* amend his pleadings once as a matter of course at any time before a response is served.... Otherwise a party *may amend* his pleading only by leave of court or by written consent of the adverse party; and *leave shall be freely given when justice so requires.*

RUSCC 15(a) (emphasis added). In fact, the Supreme Court has construed FED. R.CIV.P. 15(a), the analogue to RUSCC 15(a),[5] quite liberally:

> Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. If the underlying facts or circumstances relied upon by a [party] may be a proper subject of relief, he ought to be afforded

an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (citations omitted). In deciding how to rule on a motion to amend, then, the court must consider the presence of the following factors: undue delay, bad faith or dilatory motive on the part of the movant, futility of the proposed amendment, and undue prejudice to the opposing party. *See Poling v. Morgan,* 829 F.2d 882, 886 (9th Cir.1987). In applying this permissive standard for amending a pleading, the Supreme Court has placed a particular emphasis on the element of prejudice to the opposing party. *See United States v. Hougham,* 364 U.S. 310, 316, 81 S.Ct. 13, 17, 5 L.Ed.2d 8 (1960) ("Rule 15 of the Federal Rules of Civil Procedure ... was designed to facilitate the amendment of pleadings except where prejudice to the opposing party would result."); 6 Charles A. Wright, Arthur R. Miller & Mary K. Kane, FEDERAL PRACTICE AND PROCEDURE § 1476 (1991) ("If no prejudice is found, then leave normally will be granted.").

■ After examining both the nature and the timing of the proposed amendment, the court is unable to find that any of the factors enunciated above, including undue prejudice to plaintiff, will result if defendant's motion is granted. In its motion, the government seeks to amend its motion in order to include defenses it initially raised in its answer. The government asserted these defenses on a number of occasions, including most significantly in its Brief for the United States in Support of its Motion for Partial Summary Judgment, which was appended to the motion. (The

---

5. The Claims Court rule mirrors Federal Rule 15(a) of Civil Procedure in both language and

substance. *See Effingham County Bd. of Educ. v. United States,* 9 Cl.Ct. 177, 179–80 (1985).

government's failure to plead these defenses in the motion itself was apparently due to an oversight.) Principal, therefore, had adequate notice of the government's affirmative defenses and, in fact, argued the merits of them at oral argument. Based on these facts, the court grants the government's Motion To Amend Its Partial Motion For Summary Judgment.

### B. Motion to Strike Barnhart Affidavit

On July 12, 1989, the government filed its Motion for Partial Summary Judgment. In Appendix C to the motion, the government included an affidavit of E. Paul Barnhart, a consulting actuary. The government purportedly included Mr. Barnhart's affidavit to clarify and explain certain accepted insurance industry practices and definitions.

On September 19, 1989, Principal filed a Motion to Strike Defendant's Appendix C to its Brief In Support of its Motion for Partial Summary Judgment. In its motion, Principal contests the inclusion of Appendix C on two grounds. First, Principal argues that the government violated RUSCC 26(e), which requires supplementation of responses to interrogatories and requests for documents. Specifically, Principal contends that the government failed to supplement Principal's Interrogatory Number 7, which requested the identity of all expert witnesses the government expected to call at trial. Principal argues that the government failed to supplement that interrogatory when it failed to give Principal advance notice that it was going to include Mr. Barnhart's affidavit in its motion for partial summary judgment. This failure to notify Principal before discovery closed, Principal argues, effectively eliminated any chance Principal had to cross-examine Mr. Barnhart. Principal's second argument in opposition to Appendix C is that the inclusion of the affidavit violates RUSCC 56(f). That rule provides that affidavits accompanying summary judgment motions must themselves be admissible at trial in order to be admissible in support of a summary judgment motion. Principal argues that the subjects covered by Mr. Barnhart's affidavit—the statutory

meaning in IRC § 801(b) of the terms "noncancellable" and "guaranteed renewable"—are legal issues to which an expert witness cannot testify. Principal thus argues that because Mr. Barnhart cannot have personal knowledge of facts admissible into evidence, his affidavit cannot be considered by the court under RUSCC 56(f) in conjunction with the government's partial summary judgment motion.

■ In regard to Principal's RUSCC 26(e) argument, the court finds that the government was under no duty to supplement its interrogatory responses. The government notes that the inclusion of Mr. Barnhart's affidavit in its motion for partial summary judgment does not necessarily mean that the government plans to use Mr. Barnhart as an expert witness at trial. The government may certainly employ an affiant in support of a motion for summary judgment and then subsequently elect not to employ that same affiant at trial. In regard to the issue of adequate notice, the court finds that the government gave sufficient notice to Principal of the potential use of Mr. Barnhart in its response to Principal's Interrogatory Number 4 (which preceded the discovery deadline). In its response, the government stated that "With respect to the reserve issues, naming all of the individuals that have knowledge relevant to industry practices would be overly burdensome. We do note, however, that Mr. Paul Barnhart ... provided an affidavit in support of defendant's motion for partial summary judgment in *Aetna Life Insurance Co. v. United States ....*" The court deems this response sufficient notice to Principal that Mr. Barnhart might be utilized in support of the government's motion for partial summary judgment. This conclusion is buttressed by the fact that the *Aetna* case, which was also decided by this court, controls many of the issues presented in the instant case. Principal cannot credibly argue that it did not have an opportunity to depose Mr. Barnhart.

■ Pursuant to Principal's RUSCC 56(f) argument, however, the court must grant Principal's motion to strike. The bulk of

Mr. Barnhart's affidavit involves his interpretation of terms which are relevant to the proper construction of IRC § 801(b). The affidavit thus deals with legal issues which fall within the unique purview of this court. As such, the affidavit cannot be considered helpful, and therefore admissible, expert testimony. As the Court of Claims held in *American National Insurance Co. v. United States*, 690 F.2d 878, 231 Ct.Cl. 604, 621–22 (1982), "[t]he interpretation of statutes normally is a question of law, which does not require expert testimony." Such testimony is only needed in exceptional circumstances, *i.e.* where the testimony concerns "state law or a technical provision peculiar to the insurance industry." *Aetna Life Ins. Co. v. United States*, 16 Cl.Ct. 364, 375 (1989), *aff'd*, 935 F.2d 280 (Fed.Cir.1991).

### C. Motion for Leave to File First Amended Answer

■ On January 13, 1988, the government filed its answer to Principal's complaint. On July 12, 1989, concurrent with its motion for partial summary judgment, the government filed a Motion for Leave to File First Amended Answer. In its motion for leave, the government seeks to add two affirmative defenses to the three it raised in its initial answer.[6] The two additional defenses are offset claims relating to allegedly erroneous allowances made by the Appeals Office of the IRS in response to an appeal made by Principal. These defenses are not pertinent to the resolution of the parties' cross motions for summary judgment.

The standard for filing motions to amend answers is governed by RUSCC 15(a). As noted above, the standard for granting such motions is relatively liberal. Courts construing Rule 15(a) have generally recognized the appropriateness of amending an answer to raise additional defenses. *See,*

*e.g., Estes v. Kentucky Utils. Co.*, 636 F.2d 1131 (6th Cir.1980). The only limitation put on such proposed amendments is that they may not state a legal theory that was already considered on the merits of a prior dispositive motion. *See Adams v. Gould, Inc.*, 739 F.2d 858, 869 (3d Cir.1984); *Triplett v. LeFlore County*, 712 F.2d 444 (10th Cir.1983); *United States v. Vorachek*, 563 F.2d 884 (8th Cir.1977). Because the motion for leave to amend raises new defenses not previously considered by the court, the court can find no undue prejudice to Principal by allowing this motion. The court therefore grants the government's Motion for Leave to File First Amended Answer.

### II. Cross Motions for Partial Summary Judgment

### A. DISABLED LIVES RESERVES

The central issue before the court is whether the disabled lives reserves established by Principal under its various group insurance policies qualify for treatment as "life insurance reserves" within the definition of IRC § 801.[7] If the disabled lives reserves qualify for such treatment, then Principal properly claimed a portion of those reserves as a deduction on its taxes in 1977 and 1978.[8] If the reserves do not qualify, then the government properly assessed against Principal in 1981 the amount of those claimed deductions, plus deficiency interest.

Principal contends that each of the three disabled lives reserves are life insurance reserves or reserves established pursuant to noncancellable health and accident insurance policies, the reserves of which are considered life insurance reserves under § 801(a). Life insurance reserves are defined in § 801(b)(1) as amounts:

(A) which are computed or estimated on the basis of recognized mortality or mor-

---

6. In its motion for leave, the government originally sought to add three affirmative defenses. However, in a subsequent motion, the government's Motion to Amend Motion for Leave to File First Amended Answer, the government sought to withdraw one of those defenses. The court granted that motion on July 16, 1991.

7. The full text of § 801(b)(1) is set forth in Appendix A.

8. The amount of deductions allowable for reserves under the 1959 Act was determined according to §§ 802, 804–05.

bidity tables and assumed rates of interest, and

(B) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies.

IRC § 801(b)(1). To qualify as life insurance reserves, reserves must also be required by state law. IRC § 801(b)(2). The government concedes that all three of the disabled lives reserves established by Principal were computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest. The government also concedes that the reserves established by Principal were required by state law. What is in dispute is whether the disabled lives reserves satisfy the second prong of the life insurance reserve definition, § 801(b)(1)(B). This dispute turns on the proper construction of that provision and, as such, presents a legal issue resolvable on summary judgment. *See, e.g., United States v. Montoya*, 827 F.2d 143, 146 (7th Cir.1987); *American Nat'l Ins. Co.*, 690 F.2d 878, 231 Ct.Cl. at 621–22.[9]

### Aetna Life Insurance Co. v. United States

This court recently interpreted § 801(b)(1)(B) in *Aetna Life Insurance Co. v. United States*, 16 Cl.Ct. 364 (1989), *aff'd*, 935 F.2d 280 (Fed.Cir.1991), a case relied upon by both parties. In *Aetna*, this court considered whether the first type of disabled lives reserve at issue here—reserves established for the waiver of premium benefit—constituted life insurance reserves under § 801(b)(1)(B) or merely health and accident insurance, which is not eligible for the deductions claimed by Principal. Although this court did not address the other two disabled lives reserves issues presented here, the reasoning adopted in that case in resolving the waiver of premium benefits issue is helpful in settling the instant disputes.

As an initial matter, this court in *Aetna* noted that the definition of life insurance reserves issue was a novel one to the court. *Id.* at 376. The court found the legislative history of § 801(b)(1)(B) inconclusive. The court also found unhelpful the federal case law, treatises, and IRS rulings discussing life insurance reserves. *Id.* at 376–77. To distinguish between life insurance and health and accident insurance reserves as defined by § 801(b)(1)(B), then, the court looked to the contingency triggering the payment of benefits. The plaintiff argued that the reserves established for waiver of life insurance premiums upon disability were life insurance reserves under § 801(b)(1)(B). The plaintiff maintained that the policies establishing this reserve were essentially life insurance contracts because the contingency triggering actual payment to the insured was death. *Id.* at 377–78. The government conversely argued that the policies were health and accident insurance.[10] The government asserted that the contingency requiring payment was the loss of health or an accident which causes disability. As the court observed in *Aetna*,

---

**9.** Summary judgment disposition is also appropriate for the issues in this case relating to advertising expenses, state examination fees, and agents' debit balances. As is the case with the disabled lives reserves questions, those issues revolve around the proper construction of several provisions of the IRC: § 804(c)(1) for the advertising expenses and state examination fees issues and § 805(b)(4) for the agents' debit balances issue. As such, they also present legal issues resolvable on summary judgment.

**10.** The plaintiff in *Aetna* conceded that the policies establishing the reserves for waiver of life insurance premiums upon disability were not

noncancellable within the terms of § 801. *Id.* at 371. The plaintiff maintained that the policies at issue were life insurance, not health and accident insurance. Plaintiff asserted that it was therefore "irrelevant whether the contract provision at issue [was] cancellable or not." *Id.* In the instant case, Principal argues that one of the policies at issue—the policy providing for monthly income benefits until age sixty-five, death, or recovery from the disability, whichever occurred first—was noncancellable health and accident insurance and therefore entitled to treatment as life insurance for the purposes of § 801(b).

To [the government], the waiver of premium benefit "constitutes in effect the payment by petitioner of disability benefits to the same extent as if a totally disabled policyholder had paid annual premium in full and petitioner had thereupon repaid to the policyholder in cash the amount of the benefits provided for."

*Id.* at 377 (quoting *Monarch Life Ins. Co. v. Commissioner*, 38 B.T.A. 716, 725 (1938), *aff'd*, 114 F.2d 314 (1st. Cir.1940).

After considering these contingencies, this court in *Aetna* held that policies containing the waiver of premium benefit provision were a combination of life insurance and health and accident insurance. The court rested its holding on the fact that the waiver of premium benefit provision

involve[d] two contingencies rather than one. In order for the company to incur liability from this provision, the insured [had to] first become disabled due to an accident or loss of health. The insured [had to] then die while this disability continue[d]. Only then d[id] the plaintiff incur a monetary obligation to the policyholder beneficiary.

*Aetna*, 16 Cl.Ct. at 378.

The court then characterized each reserve by analyzing what contingency triggered the payment of benefits. In regard to the "active lives" reserve, established for the payment of waived life insurance premiums after the time of disability, the court held that these reserves were health and accident insurance. The court noted that under these policies, once an insured became disabled, this reserve was reduced to cover the cost of paying waived life insurance premiums. *Id.* The contingency for this reserve was thus disability, not death. In regard to the "disabled lives" reserve, established for the payment of life insurance upon death of the insured, the court held that these reserves were life insurance reserves. The court noted that under these policies, payment to the insured was only due upon the insured's death. *Id.* The contingency for payment of benefits from this reserve was thus death.

In the instant case, Principal argues that two of the three disabled lives reserves at issue—(1) the waiver of premium benefit reserve and (2) the monthly payment from life insurance reserve—are life insurance reserves under the definition set forth in § 801(b)(1). Principal maintains that the third disabled lives reserve at issue—the monthly income pursuant to accident and health insurance reserve—is noncancellable health and accident insurance and therefore also eligible for treatment as a life insurance reserve.

### 1. Waiver of premium benefit

■ In regard to Principal's waiver of premium benefit disabled lives reserve, the court can find no factual or legal distinction between this reserve and the one at issue in *Aetna*. The contingency which triggers the payment of benefits from Principal's disabled lives reserve to an employee is the death of the employee. As in *Aetna*, then, the reserve is a life insurance reserve within the meaning of § 801(b).

### 2. Monthly payments from life insurance

■ Principal contends that its disabled lives reserve established for monthly payments to employees from their life insurance benefits upon disability is a life insurance reserve under § 801(b). This disabled lives reserve provided for the payment of the face value amount of whatever amount of life insurance the employee had in force at the time of disability. In support of its argument that this reserve is a life insurance reserve, Principal emphasizes that the benefit payments: (1) emanated from a contract which was a life insurance contract; (2) were measured by the amount of the employees' life insurance in force; (3) were paid out as life insurance upon the death of the employee while disabled; and (4) were restored to life insurance upon the employee's recovery from disability (the amount of life insurance decreased by the aggregate amount disbursed in the monthly payments). Principal thus argues that although disability triggers the establishment of this disabled lives reserve, the contingency which triggers the payment of

benefits after disability is death. Accordingly, Principal contends, under the reasoning of this court's *Aetna* decision, this disabled lives reserve must be treated as a life insurance reserve for purposes of § 801(b).[11]

The government argues that the policies establishing this reserve are health and accident insurance combined with life insurance. The government bases its assertion on the fact that the contingency initially requiring Principal to pay benefits is the disability of the employee. Thus, the government contends, under the holding in *Aetna,* this disabled lives reserve cannot be considered solely life insurance under § 801(b).

On its face, the government's position has merit. When an employee becomes disabled, the contingency of disability indeed triggers a payment obligation. However, the government fails to appreciate that the overriding contingency insured against under this policy is the occurrence of death. If an employee never becomes disabled, the policy pays life insurance benefits upon the death of the employee. If the employee becomes disabled, the policy pays the face value amount of the employee's life insurance in monthly installments until the contingency of death, at which point the remaining amount of life insurance benefits in force is paid out to the employee's beneficiaries. The only situation in which an employee's beneficiaries will not receive benefits upon death is where the employee is disabled for more than sixty consecutive months, the point after which the entire face value amount of the employee's life insurance benefits is exhausted. It is only in this situation that the policy never operates as life insurance.

While the court recognizes that it is impossible to predict at the time of disability, *i.e.* the time of the establishment of this reserve, whether the reserve will ultimately operate as part life insurance and part

health and accident insurance or solely as health and accident insurance, the court nonetheless concludes that this reserve qualifies as a life insurance reserve under § 801(b). What leads the court to this conclusion is the fact that the amount of the monthly benefit installment made to a disabled employee is directly tied to the amount of life insurance the employee has in force at the time of disability (whether it be the first or fifth instance of disability). The monthly benefit provision of the policy is therefore not severable from the employee's life insurance benefit provision. While the amount of the life insurance benefits the employee's beneficiaries are eligible for decreases as the monthly payments are disbursed, the employee's life insurance policy nonetheless remains in force until the life insurance benefits are fully exhausted. The monthly payment benefit and the life insurance benefits are thus inexorably linked to the contingency of death, even up to the fifty-ninth consecutive payment. Based on this fact, the court finds that this disabled lives reserve constitutes a life insurance reserve under the meaning set forth in § 801(b).

A further support for this view is an economic analysis of this transaction. What the insured is really getting is an accelerated death benefit. That is, the insured has the option of getting his or her death benefit while still alive, and presumably during a time of need, instead of having the money paid out only after death to a beneficiary or the estate. The same result could also be obtained by having the insured or his or her beneficiary borrow against the death benefit while alive and have the beneficiary or estate satisfy that obligation out of the death benefit.

### 3. Monthly income pursuant to accident and health insurance

▪ Principal concedes that its disabled lives reserves established under its acci-

---

**11.** Principal takes pains to distinguish its position on this issue from that taken by the plaintiff in *Aetna.* In *Aetna,* the plaintiff conceded that "its reserves for the provision of monthly income benefits to disabled employees did not fall within" § 801(b). *Aetna,* 16 Cl.Ct. at 370. Principal contends that the plaintiff in *Aetna*

was forced to concede this point because the monthly benefit there, unlike the monthly installment benefit in this case, did not reduce the face value amount of the employee's life insurance and did not, therefore, constitute disbursement of the face value amount of the employee's life insurance.

dent and health insurance policies for the payment of monthly benefits upon disability are not life insurance reserves under the definition of § 801(b). Principal maintains, however, that these reserves must be treated as such because the policies from which they emanate are noncancellable accident and health insurance policies. Under § 801(b)(1)(B), reserves established pursuant to noncancellable accident and health insurance policies are considered life insurance reserves for purposes of determining tax deductibility. The government counters Principal's contention by arguing that these accident and health insurance policies are not noncancellable within the definition of § 801(b).

The issue for the court to decide is whether an accident and health insurance policy can become noncancellable after the inception of a policy. Principal contends that noncancellability is determined at the time a reserve is established to fund the payment of benefits. Adopting this position, Principal must and does concede that its accident and health insurance policies were, at their inception, one-year, cancellable contracts with respect to the employer-policyholder and thus were not noncancellable. At the end of each one-year contract period, Principal was free to cancel the policies or to raise premium rates. Consistent with that concession, Principal admits that the active lives reserves established for employees at the time they became covered by an accident and health insurance policy do not qualify as life insurance reserves under § 801(b).

Principal asserts, however, that at the moment the disabled lives reserve was established for an employee—when the employee became disabled—the policy became noncancellable with respect to the disabled employee. Under its policies, Principal points out, it assumed upon the disability of an employee a noncancellable obligation to pay the employee monthly income benefits. Principal thus argues that the accident and health policies at issue contained severable obligations. At the inception of the policy, Principal had a cancellable, but renewable obligation to pay employees benefits upon disability. Upon disability, however, Prin-

cipal assumed the noncancellable obligation to pay those benefits. According to Principal's interpretation of its accident and health policies, the active lives reserve established for an employee did not qualify as a life insurance reserve under § 801(b), but the disabled lives reserve did.

The government takes the position that noncancellability is determined at the time of the inception of an accident and health insurance policy. The government argues that in order for a reserve established pursuant to an accident and health insurance policy to qualify as a life insurance reserve, the terms of the policy must be unalterable at their inception. In support of its position, the government cites the *Aetna* decision, where in *dicta* this court analyzed the status of an accident and health insurance policy virtually identical to the one at issue in the present dispute.

> The policies at issue here, meanwhile, must be considered as cancellable because plaintiff did not have to renew the premiums for these policies at a specified level. Instead, plaintiff had the power to unilaterally change its premiums every year on the basis of its prior experience.

*Aetna*, 16 Cl.Ct. at 371 (citations omitted).

Although this court did not squarely address the noncancellability issue in *Aetna*, the Eighth Circuit Court of Appeals did in *United Benefit Life Insurance Co. v. McCrory*, 414 F.2d 928 (8th Cir.1969), *cert. denied*, 396 U.S. 1039, 90 S.Ct. 687, 24 L.Ed.2d 684 (1970). In *United Benefit*, the plaintiff insurance company made the identical argument asserted here by Principal.

> Taxpayer urges that once a disability claim occurs, its policy becomes a noncancellable contract as to both renewal and premium rate and therefore its disability reserve should likewise qualify under Section [801(b)]. The company urges in this regard that the district court erred ... in failing to distinguish between its cancellable policy and its noncancellable contract which arises within the policy upon the event of disability of the insured....

*Id.* at 932. After thoroughly reviewing the legislative history of § 801(b) and Department of Treasury regulations on the noncancellability issue, the court rejected the plaintiff's argument: "Although we cannot help but praise the ingenuity of [plaintiff's] theory, we cannot find authoritative support for it." *Id.* In fact, the authority the court cited linked noncancellability, as this court did in *Aetna,* to the non-alterability of premium payments at the inception of a policy. *See* H.Rep. 2333, 77th Cong., 2d Sess. (1942), 1942–2 Cum.Bull. 372, 454 ("As the term is used in the industry, a noncancelable insurance policy means a contract which the insurance company is under an obligation to renew at a specified premium, and with respect to a reserve in addition to the pro rata unearned premium must be carried to cover the renewal obligation."); Treas.Reg. § 1.801–3(c) (defining a noncancellable policy as "a contract which the insurance company is under an obligation to renew or continue at a specified premium and with respect to which a reserve in addition to the unearned premium must be carried forward to cover that obligation"); NAIC, Report to the National Association of Insurance Commissioners' Subcommittee on Definition of Non-cancellable Insurance and Guaranteed Renewable Insurance 156 (1960) ("The terms 'noncancellable' or 'noncancellable and guaranteed renewable' may be used only in a policy which the insured has the right to continue in force by the timely payment of premiums set forth in the policy (1) until at least age 50, or (2) in the case of a policy issued after the age 44, for at least five years from its date of issue, during which period the insurer has no right to make unilaterally any change in any provision of the policy while the policy is in force."); Revenue Ruling 80–115 ("Under a noncancellable health and accident contract, the insured pays a level premium that is not subject to variance by the insurer. The insurer sets aside part of this premium to cover increased actuarial risks over the term of the noncancellable policies. Congress ... recognized that insurance companies issuing noncancellable health and accident policies are engaged in a business more like life

insurance than casualty insurance because of this long-term risk involved.").

In addition to finding no legal support for the plaintiff's proposed definition of noncancellability, the *United Benefit* court refuted the plaintiff's position on the basis of common sense. The court correctly observed that if one adopted the plaintiff's interpretation of § 801(b), the distinction made by Congress between noncancellable and cancellable accident and health insurance policies would be rendered meaningless.

> Perhaps the most logical refutation to taxpayer's argument is that if the disabled reserve fund of cancellable policies may qualify under Section [801(b)] as falling within the definition of noncancellable contracts, there would have been no congressional necessity to single out "noncancellable" health and accident contracts within the statute itself. To adopt taxpayer's interpretation, all health and accident policies would qualify under Section [801(b)] at the time a disabled reserve is established since they all would become noncancellable at that time. This clearly was not intended.

*Id.* at 933.

On the grounds of both common sense and the weight of authority supporting the government's position on this issue, the court follows the holding of *United Benefit.* The court accordingly finds that the disabled lives reserve established by Principal for monthly income benefits upon disability cannot be treated as a life insurance reserve within the meaning of § 801(b).

## B. ADVERTISING EXPENSES AND STATE EXAMINATION FEES

Principal contends that it properly claimed deductions for investment related advertising expenses in 1977 and 1978. The advertising expenses claimed fall into two categories: (1) direct expenses incurred by Principal specifically for the benefit of its investment department (printing, duplicating, and promotion expenses) and (2) general institutional advertising costs allocable to Principal's investment department. Principal takes the position that both these direct and general advertising

expenses were deductible under § 804(c)(1).[12] The government takes the contrary position, arguing that both categories of expenses claimed by Principal are non-deductible because neither category was directly incurred for the benefit of Principal's investment department or for the production of investment income.

Section 804(c)(1) provides generally for the deductibility of "investment expenses for the taxable year." That provision also provides that "if any general expenses are in part assigned to or included in the investment expenses," then those expenses are also deductible, subject to stated amount limitations.[13] Treasury Regulation § 1.804–4(b)(1)(i), which clarifies § 804(c)(1), defines "investment expenses" as

those expenses of the taxable year which are fairly chargeable against gross investment income. For example, investment expenses include salaries and expenses paid exclusively for work in looking after investments, and amounts expended for printing, stationary, postage, and stenographic work incident to the collection of interest.

"General expenses" are defined by Treasury Regulation § 1.804–4(b)(1)(ii) as

any expense paid or incurred for the benefit of more than one department of the company rather than for the benefit of a particular department thereof. For example, if real estate taxes, depreciation, or other expenses attributable to office space owned by the company and utilized by it in connection with its investment function are assigned to investment expenses, such items shall be deductible as general expenses assigned to or included in investment expenses.... Sim-

ilarly, if an expense, such as a salary, is attributable to more than one department, including the investment department, such expense may be properly allocated among these departments.

In § 804(c)(1), Congress thus distinguished between expenses directly bearing on the operation of an insurance company's investment department and general expenses allocable to an insurance company's investment department. The key consequence of this distinction is the amount of deduction allowable for each type of expense: direct investment expenses are fully deductible; general expenses are only partially deductible. *See* Treas.Reg. § 1.804–4; *Northwestern Mut. Life. Ins. Co. v. United States*, 7 Cl.Ct. 501, 505 (1985), *aff'd*, 795 F.2d 74 (Fed.Cir.1986) ("The investment expense deduction of I.R.C. § 804(c)(1) includes two distinct types of expenses: investment expenses, which are fully deductible, and general expenses, which are only partially included in the investment expenses based on the extent to which they benefit the investment department. A limitation on total I.R.C. § 804(c)(1) deductions applies whenever any general expenses are included in the investment expenses. I.R.C. § 804(c)(1).").

In evaluating Principal's claimed expenses, the court must be mindful of the theoretical framework upon which IRC § 804(c)(1) rests. At the root of § 804(c)(1) is the generally accepted proposition that expenses incurred by insurance companies fall into one of three categories: (1) underwriting expenses; (2) investment expenses; and (3) general expenses. As the Court of Claims explained more fully in *New World Life Insurance Co. v. United States*, 26 F.Supp. 444, 88 Ct.Cl. 405, 432–33 (1939),

---

**12.** The full text of § 804(c)(1) is set forth in Appendix B.

**13.** Deductions claimed for general expenses allocable to the investment department cannot exceed the sum of "(A) one-fourth of one percent of the mean of the assets (as defined in section 805(b)(4)) held at the beginning and end of the taxable year, (B) the amount of the mortgage service fees for the taxable year, plus (C) whichever of the following is the greater: (i) one-fourth of the amount by which the invest-

ment yield (computed without any deduction for investment expenses allowed by this paragraph) exceeds 3¾ percent of the mean of the assets (as defined in section 805(b)(4)) held at the beginning and end of the taxable year, reduced by the amount described in subparagraph (B), or (ii) one-fourth of one percent of the mean of the value of mortgages held at the beginning and end of the taxable year for which there are no mortgage service fees for the taxable year." IRC § 804(c)(1).

*aff'd*, 311 U.S. 620, 61 S.Ct. 314, 85 L.Ed. 393 (1940), the seminal case [14] in this area:

> It is well known, and is admitted in this case, that the expenses of a life insurance company generally fall into three classes, to-wit, underwriting expenses, which are those expenses directly relating to and wholly incurred in that department; investment expenses, which are expenses directly relating to and entirely incurred in the maintenance and operation of the investment department; and general expenses, which include, and can only include, all expenses which are not definitely and entirely either investment or underwriting expenses.

All expenses incurred by an insurance company, therefore, can be allocated to one, and only one, of these three categories. It is worth noting that the third category, general expenses, is defined by way of the negative: general expenses are those which are not either underwriting or investment expenses.

Income derived from underwriting activity is subject to a different taxing scheme than income generated from investment activity. Similarly, the amount of deduction allowable for a given expense differs depending on whether the expense was incurred pursuant to underwriting or investment-based activity. Section 804(c)(1) creates a further distinction between pure investment expenses and general expenses allocable to investment activity. If the expense is "directly and entirely" related to investment activity, it is a fully deductible investment expense; if the expense is a general expense "reasonably related and susceptible of allocation" to investment activity, it is deductible only to the extent of allocation. To what extent a particular expense is deductible under § 804(c)(1) thus depends on the category to which the expense is assigned. The categorization of an expense is therefore the key criterion in determining to what extent a given expense is deductible.

### 1. Investment expenses

■ The standard for determining whether an expense qualifies as a fully deductible direct expense against investment income was first set forth in *New World*. In that case, the court defined investment expenses as "expenses directly relating to and entirely incurred in the maintenance and operation of the investment department." *Id.* at 432–33. The *New World* definition has remained in force since that decision. In *Northwestern Mutual*, the Claims Court explicitly followed the *New World* formulation:

> An expense is fairly chargeable against gross investment income if it meets the standards set forth in *New World:* directly and entirely related to investment income in the case of an investment expense....

*Northwestern Mutual*, 7 Cl.Ct. at 508. The standard is that there must not only be a tight causal connection between the expense and investment income, the claimed expense must also be entirely related to investment income.

■ In regard to the expenses Principal alleges directly benefit its investment department (printing, duplicating, and promotion costs), the court finds that they have a sufficiently direct relationship to the maintenance and operation of Principal's investment department to be fully deductible under § 804(c)(1).[15] The annual re-

---

**14.** Although *New World* was decided prior to the enactment of § 804(c)(1), it is well established that the IRC treatment of investment expenses remained unchanged from 1921 through the period governed by the Life Insurance Company Income Tax Act of 1959, the statute at issue here. *See Northwestern Mutual*, 7 Cl.Ct. at 506 n. 6; *Massachusetts Mut. Life Ins. Co. v. United States*, 5 Cl.Ct. 581, 587–89 (1984).

**15.** The court rejects the government's contention that the doctrine of variance precludes Principal's direct investment expenses argu-

ment. The government argues that because Principal claimed these expenses as general expenses allocable to the investment department at the administrative level, Principal cannot now assert that they are direct expenses and thus fully deductible. The government fails to recognize, however, that Principal has consistently maintained that these expenses were deductible under § 804(c)(1). By specifying both at the administrative level and here which provision of the IRC it bases its refund claim on, Principal has properly and with no significant variation "set[ ] forth in detail each ground

ports and financial statements on which Principal bases its claim for the printing and duplicating expenses were distributed only to investment bankers and brokers on behalf of the investment department. They were not distributed to the general public for the purposes of promoting Principal's underwriting activities. The list of placement sources to whom Principal sent its annual reports and financial statements satisfies the court that these printing and duplicating costs were directly and entirely related to Principal's investment department and to the creation of investment income. Similarly, the promotional costs Principal claims as investment expenses also must be deemed fully deductible. It is uncontroverted that these promotional costs were solely incurred by Principal's investment department and solely for the purpose of promoting Principal's investment activities. Thus, like the examples of deductible direct investment expenses set forth in Treasury Regulation § 1.804–4(b)(1)(i)—(1) salaries and expenses paid exclusively for work in looking after investments and (2) amounts expended for printing, stationary, postage, and stenographic work incident to the collection of interest—the expenses claimed here are directly and entirely incurred in the maintenance and operation of Principal's investment department. As such, these expenses are fully deductible investment expenses within the meaning of § 804(c)(1).

## 2. General Expenses

█ The standard for determining whether a general expense is allocable to an insurance company's investment activity has been a matter of some dispute among the courts considering the issue. In *New World*, the court defined general expenses as those "which are not definitely and entirely either investment or underwriting expenses." *New World*, 88 Ct.Cl. at 458. In determining whether a given general ex-

pense qualified as being deductible, the court set forth a two prong test. To be deductible, a general expense must "with some degree of reasonableness, be said to have some direct relationship to the investment department and also to be reasonably susceptible of division and assignment" to the investment department. *Id.* at 435. This test for determining the deductibility of general expenses has been followed by other jurisdictions. *See, e.g., Lutheran Mut. Life Ins. Co. v. United States*, 816 F.2d 376, 380 (8th Cir.1987) (expressly adopting the test as enunciated in *Northwestern Mutual*); *Liberty National Life Ins. Co. v. United States*, 77–1 U.S.T.C. ¶ 9107, 1976 WL 908 (D.C.Ala.1976), *rev'd on other grounds*, 600 F.2d 1106 (5th Cir. 1979), *cert. denied*, 444 U.S. 1072, 100 S.Ct. 1017, 62 L.Ed.2d 754 (1980) (*"Liberty National Life I"*) (following the *New World* test). Applying the *New World* test, courts have found state income taxes on investment income (*Northwest Mutual* and *Lutheran Mutual*), print advertisement expenses (*Liberty National Life I*), life insurance company contributions to employee profit-sharing plans (*Liberty National Life I; Liberty National Life Insurance Co. v. United States*, 816 F.2d 1520 (11th Cir.1987) (*"Liberty National Life II"*)), commissions paid to agents who, among other things, serviced loans which generated income (*Liberty Life Insurance Co. v. United States*, 594 F.2d 21 (4th Cir.1979)), and state licensing fees paid for the privilege of conducting business in the state (*Liberty Life Insurance*, in *dicta*) to be deductible general expenses.

In *Ohio National Life Insurance Co. v. United States*, 11 Cl.Ct. 477, *aff'd*, 807 F.2d 1577 (Fed.Cir.1986) (*per curiam*), however, the Claims Court construed the *New World* decision as setting forth a more demanding standard for evaluating general expenses. In interpreting the *New World* decision, the *Ohio National* court

upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." *See* Treas.Reg. § 301.-6042–2(b)(1)). Whether any of the advertising expenses claimed by Principal are fully deductible as direct investment expenses or only par-

tially deductible as general expenses under § 804(c)(1) is a legal issue solely within the purview of the court. Accordingly, whether a given expense claimed as a direct expense should properly be considered a general expense is a question for the court to decide.

placed greater emphasis on the causal connection between the general expense claimed and investment activity than on the type of expense involved, *i.e.* an investment or general expense. The court held that the deduction of general expenses allowable under § 804(c)(1) is confined

> to those general expenses that bear a *causal* connection with investment income, *i.e.*, those particular costs which, though pooled under the heading of a general expense, owe their existence entirely to the activities of the investment department. Under this standard, any portion of a general expense that is identifiable with a corporate resource (financial, physical, or human) that assists in or is utilized in the immediate activity of producing investment income would qualify for deduction. But absent an immediate connection to investment activity, the general expenses must be deemed too remote to satisfy the "direct relationship" requirement of the *New World* decision.

*Ohio National,* 11 Cl.Ct. at 480 (emphasis in original); *see also Commissioner v. Volunteer State Life,* 110 F.2d 879, 881 (6th Cir.), *cert. denied,* 310 U.S. 636, 60 S.Ct. 1080, 84 L.Ed. 1405 (1940) (holding that for general expenses to be deductible under the predecessor to § 804(c)(1), the expense "must be directly and entirely related to investment department operations"); *Union Central Life Ins. Co. v. Commissioner,* 720 F.2d 420, 423 (6th Cir.1983) (expressly adopting the *Volunteer State Life* formulation). The court thus placed greater emphasis on the first prong of the *New World* deductibility test by tightening the causal connection required between the claimed general expense and investment activity. The court interpreted the *New World* and *Union Central* decisions as offering

> more particularized expressions of the general definition for investment expenses stated in Treas.Reg. § 1.804–4(b)(1)(i): "those expenses of the taxable year which are fairly chargeable against gross investment income."

*Ohio National,* 11 Cl.Ct. at 480. This interpretation of *New World* has also been

applied by several courts. *See, e.g., Peoples Security Life Insurance Co. v. United States,* 833 F.2d 1001 (Fed.Cir.1987) (*per curiam*) (expressly accepting the reasoning and authority of *Ohio National*); *Life Insurance Co. of Georgia v. United States,* 16 Cl.Ct. 359, 361 (1989) (same). Courts applying the *Ohio National* test have found state franchise taxes (*Ohio National* and *Union Central Life*), state examination fees (*Ohio National*), agents' sales commissions (*Ohio National*), state taxes on premium income (*Peoples Security Life*), and life insurance company contributions to employee profit-sharing retirement plans (*Life Insurance Co. of Georgia*) to be non-deductible under § 804(c)(1).

Principal argues that the standard set forth in *Ohio National* misconstrues the standard for general expenses enunciated by the Court of Claims in *New World* and by the Claims Court in *Northwestern Mutual.* This argument has merit. In *New World,* the court did not find, as the *Ohio National* court suggested, that general expenses had to have "an immediate connection to investment activity" and "owe their existence entirely to the activities of the investment department" to be deductible. *Ohio National,* 11 Cl.Ct. at 477. The *New World* court never deviated from its "reasonably related and susceptible of allocation" test. The court's analysis turned on a consideration of whether a particular expense—salaries to officers and employees performing services for both underwriting and investment departments—was properly categorized as an investment or a general expense. The taxpayer in that case had claimed that the salaries constituted an investment expense rather than a general expense allocable to investment activity. By so claiming, the taxpayer had avoided exceeding the amount limitation for deducting general expenses set forth in the predecessor provision to § 804(c)(1). (As in the present deduction scheme, investment expenses were not subject to such a limitation.) The *New World* court found that the salaries were not an investment expense, but a general expense subject to the amount limitations. The court reasoned

that if an expense which benefits more than one department of a life insurance company could be claimed as a pure, fully deductible investment expense, then the general expense category would effectively be written out of § 804(c)(1).

If expenses, such as salaries of general officers and employees, which are not entirely incurred and paid in the maintenance and operation of the investment department, may be divided and assigned or allocated in part to the investment department, there would no longer be any "general expense" to which [the predecessor to § 804(c)(1) ] could apply for substantially all expenses of the company would by that method of division and assignment become either a direct investment expense or a direct underwriting expense, and the sums assigned to and included in the investment department deductible without any limitation whatever. The [predecessor to § 804(c)(1) ] would then be rendered of little, if any effect.

*New World,* 88 Ct.Cl. at 434–35.

The *New World* court thus never extended or applied the "directly and entirely related" test applicable to pure investment expenses to general expenses. The court *squarely* ruled that in order for a general expense to be deductible it must be related to investment activity "with some degree of reasonableness." *Id.* at 435. In fact, the court enumerated examples of general expenses which it suggested were reasonably allocable to investment activity—examples which either have failed, or certainly would fail, under the *Ohio National* test.

Among other expenses of a general nature which could with equal facility [as the salaries at issue] be apportioned and assigned in part to the investment department, the following might be mentioned: (1) *General advertising;* (2) salaries of legislative counsel, public relations counsel, and advertising manager; (3) *costs of publishing and mailing annual reports and financial statements;* (4) sums paid to inactive general employees or pensioners and contributions to pension funds; (5) traveling expenses of company officials attending agency and national conventions; (6) dues and assessments paid to certain bureaus and associations; (7) costs of books, newspapers, and periodicals not used exclusively in either the investment or underwriting departments; (8) public liability insurance premiums; (9) charitable donations and contributions; and (10) *license fees paid to various states for the privilege of doing business therein.*

*Id.* at 435 n. 11 (emphasis added). By requiring that general expenses satisfy essentially the same standard as that applied to pure investment expenses, the *Ohio National* court's standard blurs the distinction between general and investment expenses. This is inconsistent with the *New World* test.

Based on *New World* and its progeny, this court must reject the *Ohio National* general expense analysis. Although the *Ohio National* and *Peoples Security Life* decisions were affirmed *per curiam* by the Federal Circuit, this court must follow the Court of Claims' *New World* ruling unless and until the Federal Circuit renders an *en banc* decision overruling it. *See Mothers Restaurant, Inc. v. Mama's Pizza, Inc.,* 723 F.2d 1566, 1573 (1983) (the Federal Circuit "may overrule a prior holding having precedential status only by an *in banc* decision"); *West Seattle General Hosp., Inc. v. United States,* 1 Cl.Ct. 745, 746 (1983) ("The United States Claims Court is bound to accept as binding precedent all published decisions of the former Court of Claims 'unless and until modified by decisions of the United States Court of Appeals for the Federal Circuit or the United States Supreme Court.'" (quoting General Order No. 1, 1 Cl.Ct. XXI (1983))).

Accordingly, the court finds that Principal was entitled under § 804(c)(1) to deduct its (1) printing and duplicating costs associated with the distribution of its annual report and financial statement; (2) general institutional advertising costs (which includes its claimed promotion costs); and (3) state examination fees. All these expenses are general expenses as they are

not "definitely and entirely either investment or underwriting expenses." As suggested by the *New World* court, these expenses also satisfy the two-prong test for determining the deductibility of general expenses: they are reasonably related to investment activity and reasonably susceptible of division and assignment to the investment department. In regard to the claimed general advertising costs and costs associated with distributing annual reports and financial statements, these expenses were reasonably related to investment activity as they "benefited all departments of" Principal by "serv[ing] to increase and enhance its public recognition." *Liberty National Life*, 77–1 U.S.T.C. at 86,034. The state examination fees at issue were also reasonably related to investment activity as they enabled Principal to conduct business within Iowa and thereby generate investment income. *See Liberty Life*, 594 F.2d at 24 (suggesting that a state licensing fee would be deductible as a general expense if it was in fact a charge on the privilege of doing business in the state). These three categories of expenses were also reasonably susceptible of division and assignment to investment activity. Principal properly allocated these expenses according to the ratio of Principal's gross investment income to its total income as set forth in § 804(c)(1). This method of allocation has met with approval in several courts and this court can detect no reason to deviate from that method under the circumstances of this case. *See Northwestern Mutual*, 7 Cl.Ct. at 508; *Lutheran Mutual*, 816 F.2d at 380; *Liberty National Life*, 77–1 U.S.T.C. at 86,034 ("This court is of the opinion that this general advertising benefited all departments of the Company, and served to increase and enhance its public recognition. While it would be difficult to make a precise allocation to these departments based on the benefit received, it is apparent that the general advertising did

benefit the Company's investment program and some portion of it is therefore fairly chargeable as investment expense.").[16]

## C. AGENTS' DEBIT BALANCES

Principal contends that it properly excluded agents' debit balances in its calculation of its investment income for 1977 and 1978. The government conversely contends that these balances are not excludible assets within the meaning of IRC § 805(b)(4), the tax provision defining such assets during the years at issue. That section defines excludible assets as "all assets of the company (including nonadmitted assets), other than real and personal property (excluding money) used by it in carrying on an insurance trade or business." IRC § 805(b)(4).[17]

Plaintiff litigated this same issue for tax years 1959 through 1964 in *Bankers Life Co. v. United States*, 412 F.Supp. 62 (D.Iowa 1976), *aff'd on this issue*, 587 F.2d 893 (8th Cir.1978). In that case, the court ruled that agents' debit balances constitute assets of an insurance company for purposes of calculating taxable income. The court dismissed plaintiff's argument with the following reasoning:

> The taxpayer argues it is difficult to conceive of an asset more clearly used in carrying on an insurance business than agents' debit balances and states that the asset is "used" to attract, recruit and maintain a viable force of life insurance agents in the field. The company is equating the word "used" with the phrase "arises from."
>
> Actually, it is an asset in the nature of a receivable which results from the fact that money, which in some instances is recoverable by the company, has been advanced to its new agents. The advancements, not the resulting nonadmitted asset, are used to attract, recruit and maintain new insurance agents. The

---

**16.** The court notes that under the reasoning of *New World*, agents' sales commissions and state taxes on premium income would not be general expenses as they are "directly relating to and wholly incurred" in underwriting activities. Thus, the ultimate conclusion reached by the

Claims Court in regard to these expenses in *Ohio National* and *Peoples Security Life*, respectively, would be correct.

**17.** The full text of § 805(b)(4) is set forth in Appendix C.

agents' debit balances account itself is not used in the business. The advancement would accomplish the purpose as well, if not better, if the right of offset was abandoned and no such asset created.

All of the decided cases have held that "agents' debit balances" is an asset of the insurance company for purposes of the earning rate calculation under section 805. *Jefferson Standard Life Ins. Co. v. United States,* [408 F.2d 842 (4th Cir. 1969)]; *Southwestern Life Ins. Co. v. United States,* [1975–1 U.S.T.C. ¶ 9321 (1975)]; *Franklin Life Ins. Co. v. United States,* 67–2 U.S.T.C. ¶ 9515 [(1968)]; *Western Nat'l Life Ins. Co. v. Commissioner,* 50 T.C. 285 [(1968)].

*Bankers Life,* 412 F.Supp. at 71.

The government argues that Principal is collaterally estopped from pursuing its present claim because of the adverse *Bankers Life* decision. Principal argues that the collateral estoppel defense is inapplicable here because an IRS revenue ruling subsequent to the *Bankers Life* decision altered the legal effect of that decision. Specifically, Principal contends that Revenue Ruling 83–12, 1983–2 C.B. 99, "constituted the first explicit pronouncement by the Internal Revenue Service ... requir[ing] life insurance agents to include advances made to them in income in the year of receipt." As a result of that ruling, Principal contends, if agents must report money advances as income it is entitled to a corresponding deduction of such advances as commission expenses. Thus, Principal argues, even if the agents' debit balances are includible assets under § 805(b)(4), the basis of those includible assets is zero.

■■■ The government contends that Principal cannot prevent the application of the doctrine of collateral estoppel because its Revenue Ruling 83–12 argument is barred on the ground of variance. The government correctly points out that Principal did not raise in its refund claim before the IRS that Revenue Ruling 83–12 had the effect of reducing the basis of agents' debit balances to zero. Principal, therefore, is

alleging new legal grounds upon which to support its claim. Under the doctrine of variance,

> prior to filing tax refunds before the Claims Court and the district courts, taxpayers must have previously filed an administrative refund claim which "sets forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." Accordingly, only claims and facts raised at the administrative level, and no others, can be asserted before the court.

*Aetna,* 16 Cl.Ct. at 371 (quoting Treas.Reg. § 301.6042–2(b)(1)); *see also Cook v. United States,* 599 F.2d 400, 220 Ct.Cl. 76, 86–87 (1979); *Neptune Mut. Ass'n v. United States,* 13 Cl.Ct. 309, 321 (1987), *vacated on other grounds,* 862 F.2d 1546 (Fed.Cir. 1988). Pursuant to this doctrine, Principal is prohibited from asserting that the basis of its agents' debit balances are zero and therefore excludible in the calculation of Principal's investment income. The court would also observe that even if the doctrine of variance did not prohibit Principal from making this argument, Revenue Ruling 83–12, which took effect in 1983, has no bearing on the tax treatment of the agents' debit balances in dispute, those measured in 1977 and 1978.

■■■ The court thus turns to the government's collateral estoppel defense. In *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979), the Supreme Court enunciated the policy underlying the doctrine of collateral estoppel.

> To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

In the instant case, Principal is attempting to relitigate an issue fully and fairly settled in 1978, the latter of two tax years in dispute here. By again raising the agents' debit balances issue in this court, Principal

clearly implicates the policy underlying the collateral estoppel doctrine.

However, before applying the doctrine, the court must make the three inquiries required by the Supreme Court in *Montana*.

[F]irst, whether the issues presented by this litigation are in substance the same as those resolved against the [plaintiff] in [the prior suit]; second, whether controlling facts or legal principles have changed significantly since the [prior] judgment; and finally, whether other special circumstances warrant an exception to the normal rules of preclusion.

*Id.* at 155, 99 S.Ct. at 974; *see also Southwestern Life Ins. Co. v. United States*, 9 Cl.Ct. 102, 106 (1985). After evaluating Principal's arguments in this case against those proffered in the *Bankers Life* decision, the court cannot detect a reason not to apply the doctrine of collateral estoppel against Principal. The issues presented in the two cases are identical; no facts or relevant legal principles have significantly changed since the *Bankers Life* decision; and the court cannot detect any special circumstances warranting an exception to the well-established rules of claim preclusion. Accordingly, the court rules that Principal is not entitled to a reconsideration of the agents' debit balances issue in this court.

## CONCLUSION

Based on the foregoing, the court grants in part and denies in part each of the parties' cross motions for summary judgment. The court orders that the parties file a joint status report within sixty days from the issuance of this opinion outlining the remaining issues in dispute and specifying the refund amount Principal is due based upon this opinion. Each side to bear its own costs.

IT IS SO ORDERED.

## APPENDIX A

Internal Revenue Code of 1954 (26 U.S.C.):

SEC. 801. *Definition of life insurance company*

.    .    .    .    .

(b) [as amended by sec. 2, Life Insurance Company Tax Act for 1955, c. 83, 70 stat. 36] *Life insurance reserves defined.*—

(1) *In general.*—For purposes of this part, the term "life insurance reserves" means amounts—

(A) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and

(B) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies.

(2) *Reserves must be required by law.*—Except—

(A) in the case of policies covering life, health, and accident insurance combined in one policy issued on the weekly premium payment plan, continuing for life and not subject to cancellation, and

(B) as provided in paragraph (3), in addition to the requirements set forth in paragraph (1), life insurance reserves must be required by law.

.    .    .    .    .

## APPENDIX B

Internal Revenue Code of 1954 (26 U.S.C.):

SEC. 804. *Taxable investment income*

.    .    .    .    .

(c) [as added by sec. 2(a), Life Insurance Company Income Tax Act of 1959, *supra*] *Investment yield defined.*—For purposes of this part, the term "investment yield" means the gross investment income less the following deductions—

(1) *Investment expenses.*—Investment expenses for the taxable year. If any

general expenses are in part assigned to or included in the investment expenses, the total deduction under this paragraph shall not exceed the sum of—

(A) one-fourth of one percent of the mean of the assets (as defined in section 805(b)(4)) held at the beginning and end of the taxable year,

(B) the amount of the mortgage service fees for the taxable year, plus

(C) whichever of the following is the greater:

(i) one-fourth of the amount by which the investment yield (computed without any deduction for investment expenses allowed by this paragraph) exceeds 3¾ percent of the mean of the assets (as defined in section 805(b)(4)) held at the beginning and end of the taxable year, reduced by the amount described in subparagraph (B), or

(ii) one-fourth of one percent of the mean of the value of mortgages held at the beginning and end of the taxable year for which there are no mortgage service fees for the taxable year.

.       `       .       .       .       .

### APPENDIX C

Internal Revenue Code of 1954 (26 U.S.C.):

SEC. 805.  *Policy and other contract liability requirements*

.       .       .       .       .

(b) [as added by Sec. 2(a), Life Insurance Income Tax Act of 1959, *supra* ] *Adjusted reserves rate and earnings rates.—*

.       .       .       .       .

(4) *Assets.*—For purpose of this part, the term "assets" means all assets of the company (including nonadmitted assets), other than real and personal property (excluding money) used by it in carrying on an insurance trade or business....